**Joseph M. PALLOZZI, Lori M. Pallozzi, Plaintiffs–Appellants,**

v.

**ALLSTATE LIFE INS. CO., Defendant–Appellee.**

**Docket No. 98–7552**

United States Court of Appeals, Second Circuit.

Argued: Dec. 3, 1998

Decided: Dec. 01, 1999

As Amended Jan. 13, 2000.

Timothy A. Clune, Disability Advocates, Inc., Albany, NY, for Plaintiffs–Appellants.

Louis C. Roberts, Wilson, Elser, Moskowitz, Edelman & Dicker, New York, NY, for Defendant–Appellee.

Before: NEWMAN, LEVAL and PARKER, Circuit Judges.

LEVAL, Circuit Judge:

Plaintiffs Joseph M. Pallozzi and Lori R. Pallozzi appeal from the judgment of the United States District Court for the Northern District of New York (Scullin, *J.*) dismissing their complaint against Defendant Allstate Life Insurance Company ("Allstate") under Fed.R.Civ.P. 12(b)(6). *See Pallozzi v. Allstate Life Ins. Co.*, 998 F.Supp. 204, 208 (N.D.N.Y.1998). The complaint alleged in main that Allstate discriminated against Plaintiffs on the basis of their mental disabilities by refusing to issue them a joint life insurance policy, thereby violating Title III of the Americans with Disabilities Act (the "Act" or "ADA"), 42 U.S.C. §§ 12181–12189. Because the complaint failed to allege that Allstate's refusal to insure Plaintiffs was without actuarial justification, the district court dismissed the action. *See 998* F.Supp. at 207–08. We disagree with the court's reasoning and disposition, and therefore vacate the judgment.

*Background*

A. *Relevant statutory provisions.*

Title III of the ADA, which generally prohibits discrimination on the basis of disability by so-called "public accommodations," *see* 42 U.S.C. §§ 12181–12189, provides in Section 302(a) that

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advan-

tages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. *Id.* § 12182(a). Title III includes a long list of private facilities that qualify as "public accommodations" so long as their operations "affect commerce," including an "insurance office, professional office of a health care provider, hospital, or other service establishment." *Id.* § 12181(7)(F).

Section 501(c) of Title V of the ADA (the "safe harbor" provision) includes the following statement:

INSURANCE

Subchapters I through III of this chapter [i.e., Titles I through III of the ADA] and title IV of this Act shall not be construed to prohibit or restrict—

(1) an insurer, hospital or medical service company, health maintenance organization, or any agent, or entity that administers benefit plans, or similar organizations from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law . . . .

*Id.* § 12201(c). The safe harbor provision also states, in its so-called "subterfuge clause":

Paragraph[ ] (1) . . . shall not be used as a subterfuge to evade the purposes of [Titles] I and III of [the Act].

*Id.*

The McCarran–Ferguson Act, insofar as it bears on the instant dispute, provides:

No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance.

15 U.S.C. § 1012(b).

B. *Allegations of the complaint.*

The Pallozzis' are a married couple. Joseph Pallozzi has been diagnosed with major depression and agoraphobia, Lori Pallozzi with major depression and borderline personality disorder. Both Pallozzis have received counseling, medication, and inpatient treatment for their conditions in the past.

In October 1996, Plaintiffs applied to Allstate for a joint life insurance policy in the amount of $65,000. Allstate initially issued them a Temporary Insurance Agreement, but soon canceled the agreement based on medical information provided by Plaintiffs' psychiatrist, and refused to sell them another policy. When Plaintiffs inquired as to why they had been rejected, the carrier gave them a copy of their application and referred them to their psychiatrist for further information. Allstate refused their requests to furnish them with specific reasons for the denial.

In February 1997, Plaintiffs commenced this lawsuit against Allstate in the United States District Court for the Northern District of New York. Their complaint claimed that Allstate refused to sell them life insurance because of their mental disabilities; and that this refusal violated Title III of the ADA and failed to come within the safe harbor of Section 501(c) of the Act because the insurer's conduct violated various provisions of the New York State Insurance Law, specifically N.Y. Ins. Law §§ 2606, 2608, and 4224. It further asserted that Allstate's actions constituted a "subterfuge to evade the purposes of Title III of the ADA." The complaint sought a declaratory judgment that Allstate violated Plaintiffs' rights under Title III and New York law, and an order directing Allstate to sell Plaintiffs a life insurance policy "at a price which is based on sound actuarial principles, or actual or reasonably anticipated experience."

C. *The district court's ruling.*

In May 1997, Allstate moved to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim upon which relief may be granted. The carrier did not dispute that Plaintiffs' mental ailments are recognized "disabilities" under

the ADA, and conceded that it had refused to issue Plaintiffs a life insurance policy because of their medical history. It contended, however, that Title III of the ADA does not regulate the underwriting practices of insurance companies.

In March 1998, the district court granted Allstate's motion to dismiss the complaint. *See Pallozzi*, 998 F.Supp. at 208. After reviewing the statutory text and legislative history, the court questioned whether Title III of the ADA was intended to reach the underwriting practices of insurance companies. *See id.* at 207. Nonetheless, the court ruled that "While Title III ... does not ordinarily apply to the underwriting practices of insurance companies, an individual may not be denied insurance coverage based on a disability unless such denial is based upon sound risk classification." *Id.* Turning to the allegations in the complaint, the court found that Plaintiffs "have not alleged facts from which the Court can draw a favorable inference that the[ir] denial might not have been based on sound actuarial principles." *Id.* The court also found that Plaintiffs "have failed to provide factual support for their contention that the Defendant used the 'safe harbor' provision [of Section 501(c) of the ADA] as a subterfuge." *Id.* It accordingly dismissed Plaintiffs' Title III claim pursuant to Fed.R.Civ.P. 12(b)(6), and declined to assert supplemental jurisdiction over their state law claims. *Id.* at 208.

Plaintiffs appealed.

## Discussion

Plaintiffs advance three related arguments: (1) Title III of the ADA does regulate the underwriting practices of insurance companies; (2) its regulation of insurance underwriting is not barred by the McCarran–Ferguson Act because the ADA "specifically relates to the business of insurance"; and (3) the district court im-

posed unjustified pleading burdens in ruling on the motion under Fed.R.Civ.P. 12(b)(6). We agree with all three contentions.[1]

I. *Whether the ADA regulates insurance underwriting practices.*

■ Allstate contends that Title III of the ADA does not reach the underwriting practices of insurance companies. Plaintiffs, marshaling the text of the statute, its legislative history, and interpretive guidelines issued by the U.S. Department of Justice, argue that Title III does regulate insurance underwriting practices. We believe the text of the statute confirms Plaintiffs' position, making it unnecessary for us to examine their back-up arguments based on legislative history and administrative interpretation.

We start with the fact that Title III specifies an "insurance office" as a "public accommodation." Section 302(a) bars a "place of public accommodation" from "discriminat[ing] against [an individual] on the basis of disability in the full and equal enjoyment of [its] *goods* [and] *services*." 42 U.S.C. §§ 12181(7)(F), 12182(a) (emphasis added). The most conspicuous "goods" and "services" provided by an "insurance office" are insurance policies. Thus, the prohibition imposed on a place of public accommodation from discriminating against a disabled customer in the enjoyment of its goods and services appears to prohibit an insurance office from discriminatorily refusing to offer its policies to disabled persons, subject to the safe harbor provision of Section 501(c) of Title V. *See Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir.1999) (Posner, *C.J.*) (absent special circumstances, Title III of the ADA prohibits an insurance company

---

1. Plaintiffs also argue that Title III prohibits underwriters from denying coverage by reason of disability except on the basis of "sound actuarial principles." We need not reach that contention and express no views on it.

from refusing to sell an insurance policy to a disabled person by reason of the person's disability).

This conclusion is reinforced by the safe harbor provision of Section 501(c) of Title V and its subterfuge clause. That provision is labeled "INSURANCE." 42 U.S.C. § 12201(c). As quoted above, it first asserts that Titles I through III "shall not be construed to prohibit or restrict—(1) an insurer ... from underwriting risks, classifying risks, or administering such risks that are based on or not inconsistent with State law."[2] *Id.* It then provides, in its subterfuge clause, that the foregoing exemption for insurance underwriters in compliance with state law "shall not be used as a subterfuge to evade the purposes of [Titles] I and III of [the Act]." *Id.* The exemption for insurance underwriters whose practices are "not inconsistent with State law" strongly implies that the Act is intended to reach insurance underwriting practices that *are* inconsistent with State law. If the ADA were not intended to reach insurance underwriting under any circumstances, there would be no need for a safe harbor provision exempting underwriting practices that are consistent with state law. *See, e.g., Belloff v. Commissioner of Internal Revenue,* 996 F.2d 607, 616 (2d Cir.1993) (statutes should be construed to avoid surplusage). And, in any event, the subterfuge clause suggests that, notwithstanding compliance with state law, Titles I and III do apply to insurance

practices where conformity with state law is used as a subterfuge to evade their purposes. Considering the net effect of these provisions, it seems clear to us that Title III was intended by Congress to apply to insurance underwriting.

Allstate argues that Title III defines the term "public accommodation" to include "insurance *office[s],*" not insurance *companies.* 42 U.S.C. § 12181(7)(F) (emphasis added). This choice of words, the carrier maintains, suggests that Congress intended the statute to ensure that the disabled have physical access to the facilities of insurance providers, not to prohibit discrimination against the disabled in insurance underwriting. Furthermore, Allstate contends, because insurance policies are not actually used *in* places of public accommodation, they do not qualify as goods and services "*of* [a] place of public accommodation." *Id.* § 12182(a) (emphasis added).

■ We find those arguments unpersuasive. Title III's mandate that the disabled be accorded "full and equal enjoyment of the goods, [and] services ... of any place of public accommodation," *id.*, suggests to us that the statute was meant to guarantee them more than mere physical access. *Cf. Carparts Distribution Ctr., Inc. v. Automotive Wholesaler's Ass'n,* 37 F.3d 12, 20 (1st Cir.1994) ("To ... limit the application of Title III to physical structures ... would severely frustrate Congress's intent that individuals with disabilities fully enjoy the goods, services, privileges and advantages, available indiscriminately to other members of the general public.").[3] We

2. We understand this somewhat awkward language to mean that the Act shall not be construed to prohibit or restrict insurers from underwriting risks, classifying risks, or administering risks *in a manner* that is not inconsistent with State law.

3. *Parker v. Metropolitan Life Ins. Co.,* 121 F.3d 1006 (6th Cir.1997) (in banc), *cert. denied,* 522 U.S. 1084, 118 S.Ct. 871, 139 L.Ed.2d 768 (1998), and *Ford v. Schering–Plough Corp.,* 145 F.3d 601 (3d Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 850, 142 L.Ed.2d 704 (1999), are not to the contrary. In *Parker,* the Sixth Circuit, in banc, held that Title III does not regulate the terms and conditions of a long-term disability insurance plan offered by

an employer to its employee through an insurance company. *See* 121 F.3d at 1010–14. The court reasoned that because the employee "did not access her policy from [an] insurance office," but instead "obtained her benefits through her employer," she had "no nexus" to a public accommodation. *Id.* at 1111. In *Ford,* the Third Circuit reached the same result with respect to an identical plan, likewise reasoning that because the plan was offered to the employee via her employment, the employee "had no nexus to [an] 'insurance office' and thus was not discriminated against in connection with a public accommodation." 145 F.3d at 612–13. Although *Ford* perhaps implied it, neither *Parker* nor the *Ford* held that Title III ensures only physical

believe an entity covered by Title III is not only obligated by the statute to provide disabled persons with physical access, but is also prohibited from refusing to sell them its merchandise by reason of discrimination against their disability. *Accord Mutual of Omaha*, 179 F.3d at 559, 564. Furthermore, Allstate's insistence that the statute provides only for physical access ignores the implication of the safe harbor provision that the Act deals with the "underwriting [and] classifying [of] risks." 42 U.S.C. § 12201(c).

We find no merit in Allstate's contention that, because insurance policies are not used in places of public accommodation, they do not qualify as goods or services "of a place of public accommodation." The term "of" generally does not mean "in," and there is no indication that Congress intended to employ the term in such an unorthodox manner in Section 302(a) of Title III. Furthermore, many of the private entities that Title III defines as "public accommodations"—such as a "bakery, grocery store, clothing store, hardware store, [or] shopping center," 42 U.S.C. § 12181(7)(E), as well as a "travel service, ... gas station, office of an accountant or lawyer, [or] pharmacy," *id.* § 12181(7)(F)—sell goods and services that are ordinarily used outside the premises. On Allstate's interpretation, a bakery's refusal to sell bread to a blind person would fall outside the scope of the statute. We see no basis for reading the statute so narrowly. *Cf. id.* § 12101(b) ("It is the purpose of this [Act] ... to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities ... [and] to invoke the sweep of congressional authority ... to address the major areas of dis-

crimination faced day-to-day by people with disabilities.").

We therefore hold that Title III does regulate the sale of insurance policies in insurance offices, subject to the limitations of the safe harbor provision in Section 501(c) of Title V. As we base our holding on the statutory text—which, we find, unambiguously covers insurance underwriting in at least some circumstances—we need not consider Plaintiffs' arguments that the ADA's legislative history and the interpretive guidelines issued by the Department of Justice confirm this interpretation.[4]

## II. Whether the McCarran–Ferguson Act bars application of Title III to insurance underwriting.

Allstate contends that, even if the ADA might be read to cover insurance underwriting, the McCarran–Ferguson Act forbids such an interpretation. That Act mandates in relevant part that no federal statute "shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless [the statute in question] specifically relates to the business of insurance." 15 U.S.C. § 1012(b). It is understood to apply not only to federal statutes that literally "invalidate, impair, or supersede" state laws, but also to federal statutes that would "interfere with a State's administrative regimen." *Humana, Inc. v. Forsyth*, 525 U.S. 299, 119 S.Ct. 710, 717, 142 L.Ed.2d 753 (1999). Allstate argues that because the ADA does not "specifically relate to the business of insurance," it falls within

access to places of public accommodation. Their reasoning was that plaintiffs must have a nexus to a place of public accommodation in order to claim the protections of Title III. There is no dispute that Plaintiffs in this case have such a nexus. In any event, *Parker* and *Ford* are not directly apposite to this appeal, as those cases involved insurance plans provided in the context of employment.

4. *See, e.g., In re Olga Coal Co.*, 159 F.3d 62, 67 (2d Cir.1998) (noting that resort to legislative history is inappropriate where the meaning of a statutory provision is otherwise unambiguous); *see also Mutual of Omaha*, 179 F.3d at 563 (noting that "it is unsettled how much *Chevron* deference is to be given an agency's informal policy pronouncements," a category that "includes [the Department's] Technical Assistance Manual").

McCarran–Ferguson's prohibition. Plaintiffs maintain that the ADA does "specifically relate to the business of insurance," and therefore falls outside the prohibition. We agree with Plaintiffs.

■ In *Barnett Bank v. Nelson,* 517 U.S. 25, 116 S.Ct. 1103, 134 L.Ed.2d 237 (1996), the Supreme Court considered whether a federal statute granting certain national banks permission to sell insurance in small towns "specifically relates to the business of insurance" within the meaning of the McCarran–Ferguson Act. *Id.* at 28, 116 S.Ct. 1103. The statute conflicted with a Florida act prohibiting such sales. *See id.* at 28–29, 116 S.Ct. 1103. A unanimous Supreme Court held (per Justice Breyer) that the federal statute does "specifically relate to the business of insurance," arriving at this result by applying a four-step analysis. (1) The Court began by inquiring whether the statute "relates" to the insurance business, that is, whether it "has a connection with" insurance plans. *Id.* at 38, 116 S.Ct. 1103 (internal quotation marks and citation omitted). (2) The Court next assessed whether the statute "specifically" relates to the insurance business, that is, whether it relates to the insurance business "explicitly, particularly, [or] definitely." *Id.* (internal quotation marks and citation omitted, alteration in original). (3) The Court then examined whether the statute specifically relates to the "business of insurance," that is, whether it affects "matters ... at the core of the McCarran–Ferguson Act's concern," such as "the relation of insured to insurer and the spreading of risk." *Id.* at 39, 116 S.Ct. 1103. (4) Finally, the Court considered the statute in light of the McCarran–Ferguson Act's purposes, emphasizing that the Act serves "to protect state [insurance] regulation primarily against *inadvertent* federal intrusion." *Id.* (emphasis in original). In applying the foregoing analysis, the Court also explained that

> Neither the McCarran–Ferguson Act's language, nor its purpose, requires the Federal Statute to relate *predominantly*

to insurance. To the contrary, specific detailed references to the insurance industry in proposed legislation normally will achieve the McCarran–Ferguson Act's objectives, for they will call the proposed legislation to the attention of interested parties, and thereby normally guarantee, should the proposal become law, that Congress will have focused upon its insurance-related effects.

*Id.* at 41–42, 116 S.Ct. 1103 (emphasis in original).

Applying the analytic framework of *Barnett Bank* to this case leads us to conclude that the ADA does "specifically relate to the business of insurance," and therefore falls outside the scope of McCarran–Ferguson's prohibition. As for step one, the ADA clearly "relates" to the insurance business, insofar as Title III defines an "insurance office" as a "public accommodation," 42 U.S.C. § 12181(7)(F), and Section 501(c), which is labeled "INSURANCE," subjects insurance underwriting to the regulatory scope of the ADA under specified circumstances. *Id.* § 12201(c). These same provisions satisfy step two, demonstrating that the Act relates "specifically" to insurance. *Cf. Barnett Bank,* 517 U.S. at 38, 116 S.Ct. 1103 (contrasting statute's use of the term "business activity," which may "implicitly refer ... to insurance," with its use of the phrase "finance, banking, and insurance," which refers to insurance "*specifically*"). They are explicit and direct in their references to insurance.

Third, we find that the ADA does regulate the "business of insurance," in that it affects "matters ... at the core of the McCarran–Ferguson Act's concern," such as "the relation of insured to insurer and the spreading of risk." *Barnett Bank,* 517 U.S. at 39, 116 S.Ct. 1103. Although the safe harbor provision generally exempts insurance underwriters from the reach of Titles I through III so long as they comply with state law, Congress clearly contemplated that under some circumstances— when the conditions of the safe harbor were not met—Titles I through III would

apply to insurance underwriting practices, including the relation of insurers to those applying to become their insureds. As we read Sections 302(a) and 501(c), they prohibit insurance underwriters from denying life insurance policies to disabled persons by reason of their disabilities, except in the circumstances protected by the safe harbor. Such decisions to grant or deny an application for insurance are within the "business of insurance," as contemplated in step three of *Barnett Bank.*

Finally, turning to *Barnett Bank*'s fourth step, consideration of the ADA in light of McCarran–Ferguson's purposes also supports our conclusion. The ADA's specific references to insurance in Title III and Section 501(c) suggest that any intrusion by the statute on state insurance regulation is not *"inadvertent."* *Barnett Bank*, 517 U.S. at 39, 116 S.Ct. 1103 (emphasis in original). These references "achieve the McCarran–Ferguson Act's objectives," because they "call[ed] ... [the ADA] to the attention of interested parties" prior to its enactment, and thereby "guarantee[d] ... that Congress ... focused upon its insurance-related effects." *Id.* at 41–42, 116 S.Ct. 1103; *see also* H.R. Rep. No. 101–485, pt. 2, at 136–37 (1990) (discussing expected effects of ADA on insurance), *reprinted in* 1990 U.S.C.C.A.N. 303, 419–20; S. Rep. No. 101–116, at 84–85 (1989) (same). We therefore hold that the McCarran–Ferguson Act does not bar application of Title III to insurance underwriting.

Indeed, we believe the safe harbor provision of Section 501(c) was written by Congress with McCarran–Ferguson in mind, precisely to communicate that message. With the benefit of minimal decoding, we understand Congress to be saying:

(1) Because of the general preference expressed in McCarran-Ferguson's default rule that insurance matters be regulated by State authority, rather than by us, we require a plaintiff seeking to prove a claim arising from underwriting decisions to show that the practice complained of is proscribed not only by this statute but also by State law.

(2) If, on the other hand, the insurer uses State law as a subterfuge to evade the purposes of this Act, that also will support a claim.

(3) We set forth this separate provision (under the caption "INSURANCE") to make clear that our statute "specifically relates to the business of insurance" and therefore must be interpreted, notwithstanding McCarran–Ferguson, to regulate insurance practices.

Finally we note that the Seventh Circuit in *Mutual of Omaha* also found McCarran–Ferguson satisfied with respect to the type of discriminatory practice at issue in this case. Although ruling on a different issue, the court expressed the view that Title III forbids an insurer's discriminatory refusal to sell its policies to a disabled person, and that this interpretation of the ADA would not be barred by McCarran–Ferguson.[5] *See Mutual of Omaha*, 179 F.3d at 559, 564 ([T]hus limited to a simple prohibition of discrimination, section 302(a) does not impair state regulation of insurance ....).

III.  *Whether the district court erred in the pleading requirements it imposed.*

The district court interpreted the ADA to provide that "an individual may not be

---

5. On a different question, whether Title III prohibits a health insurer from imposing a cap on benefits for treatment of AIDS, the court ruled that it did not, and that in any event McCarran–Ferguson would bar such an interpretation. *See Mutual of Omaha*, 179 F.3d at 561–64. The Third Circuit in *Ford* ruled similarly that the ADA does not prohibit an employer and its insurer from offering employees a welfare benefits plan limiting disability payments for mental disability (but not for physical disability) to two years. *See* 145 F.3d at 608–14. The court added that McCarran–Ferguson would in any event forbid interpreting the Act to provide for such a prohibition. *See id.* at 611–12. We cannot tell from the very brief discussion of McCarran–Ferguson in the *Ford* opinion whether the Third Circuit would agree with the Seventh that McCarran–Ferguson does not bar the interpretation of the ADA that we adopt in this case.

denied insurance coverage based on a disability unless such denial is based upon sound risk classification." *Pallozzi*, 998 F.Supp. at 207. It dismissed the action because the complaint failed to allege that Allstate's denial of insurance coverage was without actuarial justification. *See id.* We believe that the district court misconstrued the safe harbor provision of Section 501(c) and imposed an unwarranted pleading burden on Plaintiffs.

■ The safe harbor provision directs that Titles I through III of the ADA shall not be construed to regulate insurance underwriting practices unless these practices are inconsistent with state law or the safe harbor itself is used as a "subterfuge" to evade the purposes of Titles I and III of the Act. *See* 42 U.S.C. § 12201(c). The provision does not explicitly state whether the obligation to plead violation of state law or subterfuge falls on the plaintiff or on the defendant. The district court, though it did not address the issue directly, assumed that the obligation falls on the plaintiff; it was on the basis of this assumption that the court interpreted the Act to require Plaintiffs to plead that Allstate's refusal to insure them lacked actuarial justification. Thus the first question is whether the district court correctly construed the safe harbor provision as adding to the elements of an ADA plaintiff's prima facie case where the plaintiff challenges insurance underwriting practices.

In *Public Employees Retirement System v. Betts*, 492 U.S. 158, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989), the Supreme Court considered an analogous question in construing Section 4(f)(2) of the ADEA. Section 4(f)(2), before Congress amended it in 1990, provided in relevant part that, notwithstanding the ADEA's general prohibition of age discrimination, it was not unlawful for an employer

to observe the terms of ... any bona fide employee benefit plan such as a retirement, pension, or insurance plan, which is not a subterfuge to evade the purposes of this chapter, except that no such employee benefit plan shall excuse the failure to hire any individual, and no such ... employee benefit plan shall require or permit the involuntary retirement of any individual ... because of the age of such individual.

29 U.S.C. § 623(f)(2) (amended 1990). The *Betts* Court explained that this provision "redefines the elements of a plaintiff's prima facie case instead of establishing a defense to what otherwise would be a violation of the Act." 492 U.S. at 181, 109 S.Ct. 2854. Thus, pursuant to Section 4(f)(2), a plaintiff who sought to challenge a "bona fide employee benefit plan" under the ADEA had the burden of pleading (and proving) that the plan was a "subterfuge to evade the purposes" of the Act. *See id.* at 181–82, 109 S.Ct. 2854. We believe that the safe harbor provision of Section 501(c) of the ADA should be construed to operate in the same manner. Accordingly, when a plaintiff pleads discrimination by an insurer in violation of Title III of the ADA in the underwriting, classifying, or administering of risks, the plaintiff has the further obligation to plead (and prove) that the insurance practice complained of is not consistent with state law or is being used as a "subterfuge to evade the purposes" of Titles I and III of the Act.

■ We next consider whether Plaintiffs' complaint met this obligation. We find it did. The complaint clearly alleged that Allstate's conduct violated various provisions of New York State law. This allegation, coupled with the further allegation that Allstate's conduct violated Title III, sufficed to state an actionable claim under the ADA. There was no basis for requiring Plaintiffs to plead in addition that the challenged conduct lacked actuarial justification.[6] The court's judgment dis-

---

6. The provisions of New York law that Plaintiffs alleged were violated by Allstate do not require a plaintiff to plead absence of actuarial justification in order to state a claim. *See* N.Y. Ins. Law §§ 2606, 2608, 4224. These provisions do permit a defendant to raise ac-

missing Plaintiffs' complaint under Rule 12(b)(6) must accordingly be vacated.

### Conclusion

The judgment of the district court is VACATED, and the case REMANDED to the district court for further proceedings consistent with this opinion.

tuarial justification as a defense to a claim that it has discriminated on the basis of disability in violation of State law. *See, e.g., id.* § 2606(d) (permitting insurer to charge higher premiums to disabled individuals and to exclude certain conditions from coverage "where the insurer can prove that its decision was based on sound underwriting and actuarial principles"). However, the fact that an insurer may seek to defend on the ground that it has relied on sound actuarial principles does not justify placing the burden on a plaintiff to plead that the insurer has failed to rely on such principles.