The Second and Seventh Circuits have similarly interpreted Title III's general rule against disability discrimination as reaching beyond physical locations of public accommodations. In 1999, citing Carparts , the Second Circuit rejected the defendant insurance company's argument that Title III was only intended to ensure that the disabled have physical access to an insurance company's offices, not freedom from discrimination in its underwriting. The statute, the court held, "was meant to guarantee ... more than mere physical access." Pallozzi v. Allstate Life Ins. Co. , 198 F.3d 28, 32 (2d Cir. 1999), opinion amended on denial of reh'g , 204 F.3d 392 (2d Cir. 2000). That same year, the Seventh Circuit held that the "core meaning" of Title III's general rule against disability discrimination was
*59 plainly enough, ... that the owner or operator of a store, hotel, restaurant, dentist's office, travel agency, theater, Web site, or other facility (whether in physical space or in electronic space, ...) that is open to the public cannot exclude disabled persons from entering the facility and, once in, from using the facility in the same way that the nondisabled do.
Doe v. Mut. of Omaha Ins. Co. , 179 F.3d 557, 559 (7th Cir. 1999) (citing Carparts, 37 F.3d at 19 ).
Other circuits have parted company with the First, Second, and Seventh Circuits, concluding that the phrase "place of public accommodation" in Title III requires "some connection between the good or service complained of and an actual physical place." Weyer v. Twentieth Century Fox Film Corp. , 198 F.3d 1104, 1114 (9th Cir. 2000). Accord Magee v. Coca-Cola Refreshments USA, Inc. , 833 F.3d 530, 534 n.23 (5th Cir. 2016) ("In following the Third, Sixth, and Ninth Circuits, we acknowledge our departure from the precedents of the First, Second, and Seventh Circuits, which have interpreted the term "public accommodation" to extend beyond physical places."); Ford v. Schering-Plough Corp. , 145 F.3d 601, 613-14 (3d Cir. 1998) (noting that by following Sixth Circuit precedent, the Third Circuit "parted company" with the First Circuit, which had held that "Title III is not limited to physical structures"); Stoutenborough v. Nat'l Football League, Inc. , 59 F.3d 580, 583 (6th Cir. 1995).[6] See also Andrews v. Blick Art Materials, LLC , 268 F.Supp.3d 381, 388-393 (E.D.N.Y. 2017) (describing circuit split).
This split in the circuits is premised to some extent on the invocation of competing canons of statutory construction. There are twelve "public accommodation" categories in the statute. See 42 U.S.C. § 12181(7). Category F includes an illustrative list of service establishments, those being "a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment." § 12181(7)(F). The First, Second, and Seventh Circuits, viewing the list of service establishments in conjunction with agency regulations, legislative history, and the broad policy goals of the ADA, concluded that the inclusion of "travel service" in the list of service establishments meant that Congress "contemplated that 'service establishments' include[d] providers of services which do not require a person to physically enter an actual physical structure." Carparts , 37 F.3d at 19. Accord Pallozzi , 198 F.3d at 32-33 ; Mut. of Omaha Ins. Co. , 179 F.3d at 558-59. The Third, Fifth, Sixth, and Ninth Circuits, relying on the principle of noscitur a sociis ("known by its associates"), concluded that because "[e]very term listed in § 12181(7) and subsection (F) is a physical place open to public access," a place of public accommodation must be, or have a connection to, a physical place. Parker v. Metro. Life Ins. Co. , 121 F.3d 1006, 1014 (6th Cir. 1997). Accord *60 Magee , 833 F.3d at 534-35 ; Weyer , 198 F.3d at 1114 ; Ford , 145 F.3d at 613-14.
Harvard does not dispute that Carparts is binding on this court, nor does Harvard dispute that some services offered online are subject to Title III's general rule prohibiting discrimination by public accommodations. Relying on cases decided by district courts in other circuits that have held that website accessibility claims rise or fall depending on whether the challenged website has a nexus to a service provided in a public accommodation's bricks and mortar location, see, e.g., Gil , 257 F.Supp.3d at 1348, Harvard argues that a nexus to a physical place is required by Title III and contends that Carparts did not consider and, thus does not rule out, such a nexus requirement. Harvard's argument falls short. The contention that Carparts did not discard a nexus requirement is meaningless on its own and incorrect in context. Only "circuits that have concluded that places of public accommodation must be physical spaces have held that the goods and services provided by a public accommodation must have a sufficient nexus to a physical place in order to be covered by the ADA." Id. Further, Harvard fails to acknowledge that the First Circuit's broad pronouncement that to "limit the application of Title III to physical structures which persons must enter to obtain good and services would run afoul of the purposes of the ADA," Carparts , 37 F.3d at 20, was made in the context of considering whether plaintiff had stated a disability discrimination claim when that claim had no nexus to any physical location operated by the defendants. Harvard's argument echoes the reasoning of the appeals courts that have "parted ways" with the First Circuit, see, e.g., Parker , 121 F.3d at 1014 (stating that "[t]o interpret these terms as permitting a place of accommodation to constitute something other than a physical place is to ignore the text of the statute"), which this court cannot do.
Even assuming arguendo that such a nexus is required, then, drawing all reasonable inferences in Plaintiffs' favor, they have pled such a nexus sufficiently to defeat Defendant's Motion. Harvard operates in a bricks and mortar location (Dkt. No. 141 at 10). Plaintiffs allege that online content Harvard has made available to the general public but failed to make accessible to deaf and hard of hearing individuals includes Harvard@Home presentations designed to " 'bring [users] inside the Harvard classroom to hear current, real-life lectures or provide [them] with a front-row seat at recent University panels, Alumni College forums, and other special events' " (Compl. at p. 15, ¶¶ 47-48); free, noncredit courses offered through the Harvard Extension School (Compl. at pp. 15-16, ¶ 49); and videos with aural content in the archives of Harvard's Peabody Museum of Archaeology and Ethnology, Harvard's Natural History Museum, the Institute of Politics John F. Kennedy Jr. Forum, Harvard's Life Sciences Outreach Program, and Harvard's Woodberry Poetry Room (Compl. at pp. 16-18, ¶¶ 50-51, 54-56). It may be inferred that this online content is the same as a good or service that is, or was, also available at one or more physical locations at Harvard. See Gil , 257 F.Supp.3d at 1349. Contrary to Harvard's contention, Plaintiffs have pled the existence of inaccessible content on websites that has "a nexus with on-campus activities" (Dkt. No. 141 at 12 n.5). Carparts and the contents of the complaint do not leave room for Harvard's argument.
The court has already rejected Harvard's contention that Plaintiffs have failed to state a claim under the ADA insofar as their complaint extends to content that Harvard "merely hosts" (Dkt. No. 141 at *61 23). As it did before, Harvard relies on cases involving movie theater captioning, see, e.g., Arizona ex rel. Goddard v. Harkins Amusement Enters., Inc. , 603 F.3d 666 (9th Cir. 2010), and the general principle that "the ADA 'does not require provision of different goods or services, just nondiscriminatory enjoyment of those that are provided.' " Id. at 671 (quoting Weyer , 198 F.3d at 1115 ). Harkins held that Weyer did not limit the Title III requirement "that a public accommodation provide auxiliary aids and services; the requirement that establishments provide auxiliary aids and services limits Weyer 's general rule that public accommodations do not have to provide different services for the disabled." Id. at 672. See Nat'l Assoc. of the Deaf , 2016 WL 3561622, at *12. The DOJ regulations state as a general principle regarding the provision of auxiliary aids and services that:
[a] public accommodation shall take those steps that may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the public accommodation can demonstrate that taking those steps would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations being offered or would result in an undue burden, i.e., significant difficulty or expense.
28 C.F.R. § 36.303(a). The regulations further provide, in provisions that govern the obligations of movie theaters to provide auxiliary aid and services, that "[a] public accommodation shall ensure that its movie theater auditoriums provide closed movie captioning and audio description whenever they exhibit a digital movie that is distributed with such features." 28 C.F.R. § 36.303(g)(2). A movie theater's obligation in the auxiliary goods and services arena is governed by a specific provision that controls over the more general obligation of public accommodations to "take those steps that may be necessary to ensure that no individual with a disability is excluded," § 36.303(a), from availing him or herself of goods and services offered by a public accommodation. Cf. Bloate v. U.S. , 559 U.S. 196, 207, 130 S.Ct. 1345, 176 L.Ed.2d 54 (2010) (stating that, as a matter of statutory interpretation, a specific provision will apply over a provision of more general application). Neither Harkins nor the DOJ regulations can be read to state the general principle - argued for by Harvard - that a public accommodation has no obligation to make content that originates with a third party accessible to disabled individuals. The DOJ regulations simply do not limit a public accommodation's obligations as to online content that it chooses to host on its websites and platforms. This "does not mean that Harvard must provide captioning as a matter of law. Harvard ... may be able to demonstrate that providing captioning, or any other available auxiliary aid or service, 'would fundamentally alter the nature' of its service or result in an undue burden." Nat'l Assoc. of the Deaf , 2016 WL 3561622, at *12 (quoting 42 U.S.C. § 12182(b)(2)(A)(iii) ). This is, however, a question of fact unsuitable for resolution on the pleadings. See Harkins , 603 F.3d at 675.
For the reasons set forth above, the court declines to grant Harvard judgment on the pleadings on Plaintiffs' ADA claim for the reasons advanced in Defendant's Motion.
2. Section 504
In its motion for judgment on the pleadings, Harvard reiterates its assertion, rejected on its motion to dismiss, that the complaint fails to state a claim under Section 504's implementing DOE regulations, *62 which state that federal fund recipients may not deny qualified handicapped individuals, "directly or through contractual, licensing, or other arrangements," the opportunity to participate in or benefit from aids, benefits, and services provided by a federal funds recipient. See 34 C.F.R. § 104.4(b)(1)(i).
As Plaintiffs point out, this court has ruled that:
[T]he general provisions of DOE's regulations ... support Plaintiffs' theory of discrimination. Section 104.4 prohibits federal fund recipients from denying qualified handicapped persons the opportunity to participate in or benefit from provided aids, benefits, or services; ... and [from] providing qualified handicapped persons with aids, benefits, or services that are not as effective as those that are provided to others.... In other words, these regulations are consistent with the requirement of "meaningful access," and ... Plaintiffs have adequately pleaded a lack of meaningful access.
Nat'l Assoc. of the Deaf , 2016 WL 3561622, at *7. For reasons explained at length, the court "decline[d] to draw any inference from the fact that § 104.4 does not explicitly address the responsibilities of federal fund recipients vis-á-vis website accessibility." Id.
Pointing to the identically phrased DOJ regulations promulgated under Title II of the ADA, Harvard contends that the "aids, benefits, and services" language in § 104.4 of the DOE's regulations implementing Section 504 covers a narrower range of functions than does the statute's broad "program or activity" language. Relying on Noel v. New York City Taxi & Limousine Commission , 687 F.3d 63 (2d Cir. 2012), and Ivy v. Williams , 781 F.3d 250 (5th Cir. 2015), vacated as moot sub nom. Ivy v. Morath , --- U.S. ----, 137 S. Ct. 414, 196 L.Ed.2d 284 (2016), Harvard argues that it merely furnishes websites or platforms on which third parties post content that Harvard does not provide or control and that this content is not an aid, benefit, or service of Harvard (Dkt. No. 141 at 14).
In Noel , the plaintiffs sued the New York City administrative agency that was responsible for licensing and regulating taxis on the grounds that most taxicabs were inaccessible for the wheelchair-bound. The Second Circuit concluded that while Title II of the ADA, which addresses discrimination by public entities, prohibited the defendants from "refusing to grant licenses to persons with disabilities who are otherwise qualified," it did "not assist persons who are consumers of the licensees' product." Noel , 687 F.3d at 69. Similarly, in Ivy , the Fifth Circuit held that because driver education was not a service of the state entity responsible for licensing private driver education schools, the licensing entity could not be held liable for discriminatory conduct by the driver education schools. Ivy , 781 F.3d at 256. The courts in Noel and Ivy relied in significant part on the DOJ's Title II Technical Assistance Manual ("TAM"), which provides that "[t]he State is not accountable for discrimination in the employment or other practices of XYZ company [an entity which the State licenses], if those practices are not the result of requirements or policies established by the State." TAM, § II-3.7200, available at https://www.ada.gov/taman2.html#II-3.7200 (last visited Mar. 20, 2019). See Ivy , 781 F.3d at 256 ; Noel , 687 F.3d at 69-70.
Harvard's reliance on these cases is not persuasive. Plaintiffs have not alleged that Harvard functions as a regulator of its websites and platforms. Plaintiffs allege that some unquantified amount of the inaccessible content on Harvard's websites and platforms is created or produced *63 directly by Harvard, not by a third party (Compl. at p. 10, ¶¶ 9-10). And, in the absence of a factual record, the role Harvard plays in connection with content that Harvard itself may not create or produce is a matter of conjecture. Moreover, Plaintiffs allege, as to all of Harvard's online content, that Harvard "uses administrative methods, practices, procedures and policies" that result in a lack of captioning or inaccurate captioning (Compl. at p. 11, ¶¶ 33-39). The DOJ, in TAM, as well as the courts in the Noel and Ivy cases, recognize that public entities may not establish requirements or policies governing the activities of the private actors they regulate that would result in discrimination against individuals with disabilities. TAM, § II-3.7200; Ivy , 781 F.3d at 256 (stating that "a public entity cannot 'discriminate directly or through contractual, licensing, or other arrangements' ") (quoting 28 C.F.R. § 35.130(b)(1) ); Noel , 687 F.3d at 70 (stating that TAM provides that licensing standards are covered by Title II although the licensee's activities themselves are not covered). Plaintiffs allege, albeit on information and belief, that Harvard has done so.
Moreover, the regulations DOE has promulgated under Section 504 do not express the limits on responsibility that Harvard claims exist. The DOJ Title II ADA regulations that set forth the general prohibition against discrimination include the limitation that a public entity may not discriminate against a qualified handicapped individual in the administration of a licensing or certification program but "[t]he programs or activities of entities that are licensed or certified by a public entity are not, themselves, covered by this part." 28 C.F.R. § 35.130(b)(6). DOE Section 504 regulations lack a parallel provision. Instead, the general prohibition against discrimination provides without limitation that a federal aid recipient may not discriminate in providing any aid, benefit or service to a disabled individual "directly or through contractual, licensing, or other arrangements." 34 C.F.R. § 104.4(b)(1)(i)-(vii). In the absence of any persuasive support for limiting the general prohibition against discrimination in the provision of aids, services, and benefits to the disabled under Section 504, Harvard's contentions in its motion for judgment on the pleadings fail. For the reasons previously stated, see Nat'l Assoc. of the Deaf , 2016 WL 3561622, at *5-10, and those stated herein, Plaintiffs have sufficiently alleged their claim under Section 504.
3. Third-Party Websites
The complaint extends beyond Harvard's own websites and platforms to websites hosted by third parties, including Harvard on YouTube, Harvard on iTunes U; and Harvard on SoundCloud (Compl. at p. 9, ¶ 29(a)-(c)). Harvard asserts that even if Harvard's websites qualify as places of public accommodation under Title III (which it does not concede), it cannot be responsible under Title III or Section 504 for content posted on these third-party websites (Dkt. No. 141 at 20-21). Implementing regulations applicable to Title III and Section 504 prohibit disability discrimination by a public accommodation or a federal fund recipient "directly or through contractual, licensing, or other arrangements." 28 C.F.R. § 36.202(b) ; 34 C.F.R. § 104.4(b)(1). Forbidden discrimination extends to denial of participation in "any program or activity" of an entity that receives federal assistance, 34 C.F.R. § 104.4(a), or the "goods, services, facilities, privileges, advantages, or accommodations" of a place of public accommodation. 28 C.F.R. § 36.202(a). The complaint alleges violations of Title III and Section 504 by Harvard as to content on these third-party websites. It may be that Harvard does not arrange for inaccessible content *64 to appear on these platforms, or that Harvard lacks control over how content is displayed on third-party websites, or that captioning would not provide meaningful access to content on third-party websites for deaf and hard of hearing individuals, or that requiring captioning would fundamentally alter the nature of the service or result in an undue burden. Those are questions raised by Harvard's affirmative defenses. The court cannot make such determinations in the absence of a more developed factual record. See Nat'l Assoc. of the Deaf , 2016 WL 3561622, at *12.
C. Communications Decency Act Immunity
Finally, Harvard argues that it is entitled by the Communications Decency Act of 1996, 47 U.S.C. § 230 (" Section 230" or "CDA"), to immunity as to so much of Plaintiffs' complaint as seeks an accommodation with respect to content created by third parties that is posted on Harvard's websites and platforms or embedded in content posted on Harvard's websites and platforms but hosted elsewhere on the Internet.
1. The Legal Framework
Section 230 provides, in pertinent part:
(c) Protection for 'Good Samaritan' blocking and screening of offensive material
(1) Treatment of publisher or speaker No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.
Section 230(c)(1)"shields website operators from being 'treated as the publisher or speaker' of material posted by users of the site, 47 U.S.C. § 230(c)(1), which means that 'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions - such as deciding whether to publish, withdraw, postpone or alter content - are barred.' " Jane Doe No. 1. v. Backpage.com, LLC , 817 F.3d 12, 18 (1st Cir. 2016) (quoting Zeran v. Am. Online, Inc. , 129 F.3d 327, 330 (4th Cir. 1997) ). The CDA defines an interactive computer service ("ICS") as "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including ... such systems operated or services offered by libraries or educational institutions. " 47 U.S.C. § 230(f)(2) (emphasis supplied). See Small Justice LLC v. Xcentric Ventures LLC , 873 F.3d 313, 318 (1st Cir. 2017). An "information content provider" ("ICP") is defined, in turn, as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service." 47 U.S.C. § 230(f)(3). "This is a broad definition, covering even those who are responsible for the development of content only 'in part.' " Universal Commc'n Sys., Inc. v. Lycos, Inc. , 478 F.3d 413, 419 (1st Cir. 2007). "A key limitation in Section 230... is that immunity only applies when the information that forms the basis for the ... claim has been provided by 'another information content provider.' ... Thus, an interactive computer service provider remains liable for its own speech." Id. (quoting 47 U.S.C. § 230(c)(1) ; citing Anthony v. Yahoo! Inc. , 421 F.Supp.2d 1257, 1262-63 (N.D. Cal. 2006) ). "[T]here may be several information content providers with respect to a single item of information (each being 'responsible,' at least 'in part,' for its 'creation or development')." Fed. Trade Comm'n v. Accusearch Inc. , 570 F.3d 1187, 1197 (10th Cir. 2009).
*65 "Congress enacted [the CDA] partially in response to court cases that held internet publishers liable for defamatory statements posted by third parties on message boards maintained by the publishers." Backpage.com , 817 F.3d at 18. "In specific statutory findings, Congress recognized the Internet and interactive computer services as offering 'a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.' " Zeran , 129 F.3d at 330 (quoting section 230(a)(3) ). "Congress made a policy choice ... not to deter harmful online speech through the separate route of imposing tort liability on companies that serve as intermediaries for other parties' potentially injurious messages." Id. at 330-31. Accordingly, "[t]here has been near universal agreement that section 230 should not be construed grudgingly." Backpage.com , 817 F.3d at 18 (citing Doe v. MySpace, Inc., 528 F.3d 413, 418 (5th Cir. 2008) ; Lycos , 478 F.3d at 419 ; Almeida v. Amazon.com, Inc. , 456 F.3d 1316, 1321-22 (11th Cir. 2006) ; Carafano v. Metrosplash.com, Inc., 339 F.3d 1119, 1123 (9th Cir. 2003) ). The broad construction accorded to Section 230(c) has resulted in the recognition by courts across the country that " 'many causes of action might be premised on the publication or speaking of what one might call 'information content.' ' " Id. at 19 (quoting Barnes v. Yahoo!, Inc. , 570 F.3d 1096, 1101 (9th Cir. 2009) ).
Thus, courts have invoked the prophylaxis of section 230(c)(1) in connection with a wide variety of causes of action, including housing discrimination, see Chi. Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc. , 519 F.3d 666, 671-72 (7th Cir. 2008), negligence, see Doe , 528 F.3d at 418, Green v. Am. Online (AOL) , 318 F.3d 465, 470-71 (3d Cir. 2003), and securities fraud and cyberstalking, see Lycos , 478 F.3d at 421-422.
Id. See also Sikhs for Justice, Inc. v. Facebook, Inc. , 697 Fed. App'x. 526, 526 (9th Cir. 2017) ("[W]e have found no authority, and [plaintiff] fails to cite any authority, holding that Title II of the Civil Rights Act of 1964 provides an exception to the immunity afforded to [defendant] under the CDA.").
Under Lycos , for Harvard to avail itself of the immunity set forth in Section 230(c)(1), " '(1) [Harvard] must be a provider or user of an [ICS]; (2) the Plaintiffs' claim [must be] based on information provided by another [ICP]; and (3) the claim [must] treat [Harvard] as the publisher or speaker of that information.' " Small Justice, LLC , 873 F.3d at 318 (quoting Lycos , 478 F.3d at 418 ). If Plaintiffs' claims treat Harvard in the capacity of an ICS publishing a third party's content, then, "as the publisher of a particular posting, immunity applies not only for [Harvard's] decisions with respect to that posting, but also for its inherent decisions about how to treat postings generally." Lycos , 478 F.3d at 422.
2. CDA Immunity and This Case
The complaint defines "Harvard's Online Content," which is the basis of Plaintiffs' claims, as online content that Harvard produces and/or makes available on its platforms and seeks to hold Harvard responsible regardless of whether Harvard creates or produces the content that either completely lacks captioning or lacks accurate captioning (Compl. at pp. 10-11, ¶¶ 28, 36). Harvard argues that it is entitled to CDA immunity to the extent Plaintiffs seek to hold Harvard liable for providing server space and websites and platforms for content posted by third parties and for embedded content for which Harvard's websites and platforms merely provide enabling tools that display others' content *66 (Dkt. No. 141 at 17). Plaintiffs respond, first, that CDA immunity only applies to the content of online material and has no application to the failure to accommodate that is the basis of their claims, and, second, that the CDA does not provide immunity for an entity like Harvard that controls who can post on its websites and platforms (Dkt. No. 147 at 18).
Plaintiffs have not pointed to any support for their claim that the CDA does not apply when a plaintiff claims disability discrimination based on a lack of access rather than on the content of speech, and the court has found none. The CDA exempts certain laws from its reach. Federal and state antidiscrimination statutes are not exempted. See 47 U.C.S. § 230(e) (providing that the CDA has no effect on criminal law, intellectual property law, communications privacy law, sex trafficking laws, or state laws that are consistent with the CDA). The Seventh Circuit considered and rejected an argument similar to the argument made by Plaintiffs. In its suit against Craigslist, the plaintiff Lawyers' Committee for Civil Rights Under Law ("Lawyers' Committee") argued that " 'nothing in § 230 's text or history suggests that Congress meant to immunize an ISP from liability under the Fair Housing Act. In fact, Congress did not even remotely contemplate discriminatory housing advertisements when it passed § 230.' " Chicago Lawyers' Comm. for Civil Rights Under Law , 519 F.3d at 671. The Seventh Circuit acknowledged the absence of evidence that Congress considered the Fair Housing Act or the CDA's possible effect on housing discrimination when it passed the statute, but it rejected the Lawyers' Committee's contention, reasoning that, in enacting the CDA, Congress intentionally passed a general statute and that "[t]he question [wa]s not whether Congress gave any thought to the Fair Housing Act, but whether it excluded § 3604(c) [the Fair Housing Act prohibition against discrimination] from the reach of § 230(c)(1)." Id. (citing Regional Rail Reorganization Act Cases , 419 U.S. 102, 126-127, 95 S.Ct. 335, 42 L.Ed.2d 320 (1974) ).
Plaintiffs' plea for access to aural content available on the Internet is compelling. So were the claims made by the victims of sex trafficking in Backpage.com , as the First Circuit recognized. Backpage.com , 817 F.3d at 15. Just as the plaintiffs in Backpage.com could point to the Trafficking Victims Protection Reauthorization Act of 2008, 18 U.S.C. §§ 1591, 1595, as a congressional acknowledgement of the evils of sex trafficking and their right to protection, Backpage.com , 817 F.3d at 15, Plaintiffs in the instant case can point to Section 504 and Title III as an acknowledgement of the vital importance of equal access to goods and services for individuals with disabilities, including deaf and hard of hearing individuals. As the First Circuit observed in Backpage.com , "[t]hese laudable legislative efforts do not fit together seamlessly, and this case reflects the tension between them." Id. In Backpage.com , faced with this tension, the First Circuit reaffirmed the view it expressed in Lycos about the breadth of the immunity conferred by Section 230. That view, which is binding on this court, does not leave room for Plaintiffs' contention that the CDA simply does not apply to discrimination claims seeking accommodation for the disabled.[7]
*67 Turning to the three-part inquiry set out in Lycos , Plaintiffs allege that Harvard "controls, maintains and/or administers webpages, websites, and other Internet locations ('Harvard Platforms') on which content is made available to the general public," (Compl. at p. 8, ¶ 28) and that Harvard's websites and platforms "enable[ ] computer access by multiple users to [the] computer server[s]" on which the content that is the subject of Plaintiffs' complaint is hosted (Compl. at p. 20, ¶¶ 63-74). Harvard acknowledges that it hosts platforms to which online content may be uploaded (Answer at pp. 2, 6, ¶¶ 2, 28). Congress chose to include educational institutions in its definition of ICS providers. 47 U.S.C. § 230(f)(2). Congress did not, as Plaintiffs suggest in passing, limit its definition of the term "interactive computer services" as that term is applied to libraries and educational institutions (Dkt. No. 147 at 19 n.23). " '[W]hen [a] statute's language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd - is to enforce it according to its terms.' " Sebelius v. Cloer , 569 U.S. 369, 381, 133 S.Ct. 1886, 185 L.Ed.2d 1003 (2013) (quoting Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A. , 530 U.S. 1, 6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000) ). Plaintiffs allege that Harvard hosts a vast array of online content addressing a wide range of topics. It is not absurd to treat Harvard as an ICS provider under the CDA. The pleadings and the statute support Harvard's contention that it functions as an ICS provider "within the meaning of Section 230." Lycos , 478 F.3d at 419 (a website operator is a provider of interactive computer services).
Plaintiffs seek relief as to online content that Harvard creates and/or produces and other online content that it makes available on its websites and platforms (Compl. at p, 29). Harvard states in its answer that "in many instances it does not create or control the online content" on its platforms (Answer at p. 2, ¶ 2). To the extent Harvard provides platforms on which third parties post content that Harvard does not create, produce, or substantively alter, see Doe No. 1 v. Backpage, LLC , Civil Action No. 17-11069-LTS, 2018 WL 1542056, at *1 (D. Mass. March 29, 2018), Harvard is hosting information provided by another ICP. A fair reading of the complaint is that, while Plaintiffs are seeking relief in connection with content created or produced by Harvard, they are also seeking relief as to content that is created or produced by third parties but is available on a Harvard platform or website, (Compl. at pp. 10, 11 ¶¶ 31, 36, 39), thereby satisfying the second part of the inquiry as to some undefined portion of Harvard's online content.
Whether Section 230 applies "does not depend on the form of the asserted cause of action; rather, it depends on whether the cause of action necessarily requires that the defendant be treated as the publisher or speaker of content provided by another." Backpage , 817 F.3d at 19. To prevail on their Title III and Section 504 claims, Plaintiffs will be required to prove that Harvard discriminated against them by failing to affirmatively accommodate deaf and hard of hearing individuals where an auxiliary aid was necessary to provide such individuals with meaningful access to online content, Nat'l Assoc. of the Deaf , 2016 WL 3561622, at *4 (citing Nunes , 766 F.3d at 144 ), that is created or developed by Harvard or that is created or developed by a third party. This case is a classic auxiliary aids case, and Plaintiffs have adequately alleged liability under Title *68 III and Section 504. Cases decided by the First Circuit and other circuits, and Congress's decision to include educational institutions in the CDA's definition of ICS providers, however, support the conclusion that holding Harvard liable for the inaccessibility of online content created or developed by a third party when Harvard does not alter that content would impermissibly "involve treating [Harvard] 'as the publisher' of 'information provided by another information content provider.' " Lycos , 478 F.3d at 422.[8]
That Harvard is alleged to control who can post on its websites and platforms would not divest it of Section 230 immunity. " '[L]awsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions - such as deciding whether to publish, withdraw, postpone or alter content - are barred.' " Backpage.com , 817 F.3d at 18 (quoting Zeran , 129 F.3d at 330 ). The CDA relieves ICS providers from liability when they exercise control such as "blocking and screening of third-party content." Id. See also Craigslist , 519 F.3d at 669 (recognizing that Section 230 relieves ICSs from liability whether or not they filter third-party postings). In Lycos , the First Circuit closed the door on the argument that an ICS's control over the "construct and operation" of a website could be a basis for liability when a claim treats the ICS as the publisher of third-party content. Lycos , 478 F.3d at 422. Harvard's "choices about what [third party] content can appear on [its] website[s] and in what form, are editorial choices that fall within the purview of traditional publisher functions" protected by Section 230. Backpage.com , 817 F.3d at 21 ; see also Klayman v. Zuckerberg , 753 F.3d 1354, 1358 (D.C. Cir. 2014) (rejecting the argument that Facebook did not qualify as an ICS because it could control the content posted on its website; "[t]he short answer is that Congress did not write that additional limitation into the [CDA]").
The remaining question is whether CDA immunity entitles Harvard to any relief on its motion for judgment on the pleadings. "Preemption under the Communications Decency Act is an affirmative defense, but it can still support a motion to dismiss if the statute's barrier to suit is evident from the face of the complaint." Id. at 1357 (citing Jones v. Bock , 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) ; Jones v. Horne , 634 F.3d 588, 600 (D.C. Cir. 2011) ). "Where a court grants a Rule 12(b)(6) or Rule 12(c) motion based on an affirmative defense, the facts establishing that defense must: (1) be 'definitively ascertainable from the complaint and other allowable sources of information,' and (2) 'suffice to establish the affirmative defense with certitude.' " Gray v. Evercore Restructuring L.L.C. , 544 F.3d 320, 324 (1st Cir. 2008) (quoting Nisselson v. Lernout , 469 F.3d 143, 150 (1st Cir. 2006) ). A plaintiff is "not required to anticipate and plead around affirmative defenses raised by [a defendant]." Dennett v. Archuleta , 982 F.Supp.2d 166, 169 (D.R.I. 2013) (citing Gomez v. Toledo , 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980) ). Harvard asks for partial judgment on the pleadings on the basis of Section 230 immunity as to third-party content that Harvard hosts[9] and content *69 embedded in Harvard's audiovisual content that is hosted elsewhere on the Internet.[10] Harvard defines third-party content that it hosts - as opposed to creates or develops or that is embedded - to include content posted by students, individual faculty members, and other scholars (Dkt. No. 141 at 6). Plaintiffs contend that Harvard is entitled to no relief because the complaint adequately alleges that all content posted on Harvard's websites, webpages and other platforms is "Harvard's Online Content" and that Harvard is not entitled to CDA immunity for online content created by individuals such as faculty members and students who are closely associated with Harvard (Dkt. No. 147 at 17-18).
With one exception addressed below, Harvard's invocation of CDA immunity is premature. Plaintiffs, who were not required to anticipate Harvard's affirmative CDA immunity defense in their complaint, have broadly alleged that Harvard is responsible for the content that is hosted on its websites and platforms (e.g., Compl. at pp. 8, 11, 15, ¶¶ 28, 33, 48). As Plaintiffs point out, Harvard seeks immunity from liability for a "vast array of content" that is wholly undefined in the record before the court (Dkt. No. 147 at 20). The court cannot determine as a matter of law that Harvard is not in some measure a content provider as to information on its platforms that originates with students, faculty members, or other scholars. See, e.g., Blackstone Realty LLC v. Fed. Deposit Ins. Co. , 244 F.3d 193, 197 (1st Cir. 2001) (stating that, "for dismissal to be allowed on the basis of an affirmative defense, the facts establishing the defense must be clear 'on the face of the plaintiffs' pleadings' " (quoting Aldahonda-Rivera v. Parke Davis & Co. , 882 F.2d 590, 591 (1st Cir. 1989) )); see also 47 U.S.C. § 230(f)(3) (defining an information content provider as "any person or entity that is responsible, in whole or in part, for the creation or development of information provided through the Internet or any other interactive computer service").
Even at this stage, however, it is apparent that the CDA will shield Harvard from liability for offending content (i.e., content that is uncaptioned or is otherwise inaccessible to a deaf or hard of hearing individual) that is merely embedded within online content produced or created by Harvard, however "Harvard" is defined for these purposes. By definition, embedded content is content hosted on a third-party server that is hyperlinked in its existing form to content that is hosted on a Harvard platform or website. See Goldman , 302 F.Supp.3d at 587. To the extent such content is not content that was created or developed in whole or in part by Harvard, Harvard cannot be an information content provider as to embedded content. See 47 U.S.C. § 230(f)(3) ; see also Small Justice, LLC , 873 F.3d at 322 (concluding that, where the defendant did not alter the content posted by the third party, *70 the defendant could not "be said to have been 'responsible for ... create[ing] or develop[ing]' that content by reason of having actually authored it, whether in whole or in part"). Even if Plaintiffs can show that the construction and operation of Harvard's platforms and websites limit in some way the content that can be embedded in postings on Harvard's platforms and websites, Harvard would remain a publisher under the CDA as to embedded content. See Backpage.com , 817 F.3d at 20. Where Harvard or someone associated with Harvard is embedding a third party's content that Harvard or someone associated with Harvard did not create or develop in whole or in part - in other words, is publishing a third party's content - Harvard is entitled to CDA immunity, see id. at 20-23, and to judgment on the pleadings as to this aspect of Plaintiffs' claims. See Klayman , 753 F.3d at 1357.
III. CONCLUSION
For the foregoing reasons, the court DENIES in part and GRANTS in part Harvard's Motion for Judgment on the Pleadings.

In Rendon v. Valleycrest Productions, Ltd. , 294 F.3d 1279, 1283 (11th Cir. 2002), the Eleventh Circuit concluded that the plaintiffs had successfully pled a Title III claim when they alleged an "intangible" barrier, i.e. an eligibility requirement or screening policy, that prohibited their full access and enjoyment of a good or service (a gameshow) at a place of public accommodation. District courts in the Eleventh Circuit have cited this decision as support for the rule that there must, at minimum, be some connection alleged between an online service and an actual physical location operated by the defendant. See, e.g., Gil v. Winn-Dixie Stores, Inc. , 257 F.Supp.3d 1340, 1348 (S.D. Fla. 2017).

Plaintiffs' reliance on the Seventh Circuit opinions that decline to read Section 230 as providing broad immunity for website operators is misplaced (Dkt. No. 147 at 21) in view of the First Circuit's controlling pronouncements. See, e.g., Backpage , 817 F.3d at 19 ; Lycos , 478 F.3d at 415 ("In Section 230 of the Communications Decency Act (CDA), 47 U.S.C. § 230, Congress has granted broad immunity to entities ... that facilitate the speech of others on the Internet.").

Plaintiffs' claims under the ADA and Section 504 also remain subject to Harvard's affirmative defenses that providing captioning or another auxiliary aid or service would result in an undue burden or fundamentally alter the nature of its online services. See Nat'l Assoc. of the Deaf , 2016 WL 3561622, at *12 (citing Harkins , 603 F.3d at 675 ).

Hosting content accessible via the Internet requires "(1) static IP (Internet protocol) addresses through which the web sites may be reached ...; (2) a high-speed physical connection through which communications pass between the Internet's transmission lines and the web sites; and (3) storage space on a server (a computer and hard disk that are always on) so that the content of the web sites can be accessed reliably." Doe v. GTE Corp. , 347 F.3d 655, 657 (7th Cir. 2003).

Embedding an image on a webpage requires using a code that allows the individual posting content to incorporate an image hosted on a third-party server into a posting. See Goldman v. Breitbart News Network, LLC , 302 F.Supp.3d 585, 587 (S.D.N.Y. 2018). "An embedded image will ... hyperlink (that is, create a link from one place in a hypertext document to another in a different document) to the third-party website. The result: a seamlessly integrated [posting], a mix of text and images, although the underlying images may be hosted in varying locations." Id.