Filed 8/1/22

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ALEJANDRO MARTINEZ, | B314476 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. 20STCV33139) |
| v. | |
| COT'N WASH, INC., | |
| Defendant and Respondent. | |

APPEAL from the judgment of the Superior Court of Los Angeles County, Rupert A. Byrdsong, Judge. Affirmed.

Pacific Trial Attorneys, Scott J. Ferrell, Victoria C. Knowles and Richard H. Hikida for Plaintiff and Appellant Alejandro Martinez.

Lahti Helfgott, Brian E. Lahti and Jonathan A. Helfgott for Defendant and Respondent Cot'n Wash, Inc.

_____

Alejandro Martinez, as successor in interest to his brother Abelardo Martinez, Jr., seeks reversal of a judgment of dismissal following the successful demurrer of Cot'n Wash, Inc. (CW) to a complaint against CW alleging a single violation of the Unruh Civil Rights Act (Civ. Code, § 51 et seq.) (the Unruh Act). The operative complaint alleged CW violated the Unruh Act by intentionally maintaining a retail website that was inaccessible to the visually impaired because it was not fully compatible with screen reading software. On appeal, Martinez argues that the trial court erred in concluding (1) the alleged inaccessibility of CW's website did not violate the Americans with Disabilities Act (42 U.S.C. § 12111 et seq.) (the ADA), specifically Title III of the ADA (42 U.S.C. §§ 12181–12189) (Title III) and (2) the complaint did not allege sufficient facts to establish CW's discriminatory intent, which the Unruh Act requires in the absence of an ADA violation.

We hold that the trial court was correct on both points. As to intentional discrimination, the California Supreme Court has held that the discriminatory effect of a facially neutral policy or action is not alone a basis for inferring intentional discrimination under the Unruh Act. (See *Koebke v. Bernardo Heights Country Club* (2005) 36 Cal.4th 824, 854 (*Koebke*).) It follows that we cannot infer intentional discrimination from Martinez's alleged facts that he made CW aware of the discriminatory effect of CW's facially neutral website, and that CW did not ameliorate these effects.

As to the ADA violation theory, Martinez has not alleged, as he must in order for Title III of the ADA to apply, that CW's website constitutes a "place of public accommodation." (42 U.S.C. § 12182(a).) Under current law, we cannot read this phrase as including retail websites without any connection to a physical space. The statutory language does not include a category that encompasses such websites, and Congress has chosen not to amend

the ADA to clarify whether and under what circumstances a website can constitute a "place of public accommodation"—despite Congress recognizing over 20 years ago the lack of clarity on this point and the resulting federal circuit split that persists today. We cannot rely, as Martinez encourages us to, on the policy goals of the ADA as a basis for ignoring the plain language of the statute and doing what Congress has for decades declined to do.  Nor do we find persuasive that the United States Department of Justice (DOJ), the regulatory agency charged with implementing the ADA, has unofficially endorsed a view that all retail websites constitute "place[s] of public accommodation" for purposes of the ADA. Regardless of what the DOJ has said in amicus briefs, it has opted not to issue any regulations or formal guidance to this effect, even after repeated requests from Congress that the DOJ do so.  This weighs against, not in favor, of Martinez's proposed interpretation.

We do not disagree that facilitating access to retail websites would serve the goals of the ADA.  Nonetheless, compatibility with the goals of legislation is not the only consideration in interpreting it.  We cannot ignore the canons of statutory interpretation to achieve the goal Martinez identifies.  Nor may we act to expand the scope of a law when Congress has chosen not to do so.

Accordingly, we affirm the judgment of dismissal.

## FACTS AND PROCEEDINGS BELOW

In the operative first amended complaint (FAC), Abelardo Martinez, Jr.[1] alleges a single cause of action against CW for violation of the Unruh Act, which provides that "[a]ll persons within the jurisdiction of this state . . . no matter what their . . . disability . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Civ. Code, § 51, subd. (b).)[2]

### A.  *Allegations of the FAC*

The FAC alleges the following facts:  CW "owns, operates and provides to the public" a website that "provides access to [CW's] array of products and services, including descriptions of its products, . . . [and an] online shop."  CW is not alleged to offer any products and services at any physical location, or in any manner other than through its website.

Martinez is "permanently blind and uses screen readers in order to access the internet and read website content."  There are "well-established, industry standard guidelines for ensuring

---

[1] Abelardo Martinez, Jr. died during the pendency of this appeal.  We subsequently granted a joint motion to substitute Martinez's brother, Alejandro Martinez, as his successor in interest pursuant to Code of Civil Procedure sections 377.31, 377.32, and 903.  We will use the surname "Martinez" to refer both to the individual described in the FAC and the current appellant.

[2] CW filed a demurrer to Martinez's original complaint, which the court sustained with leave to amend, based on insufficiency of the allegations to support intentional discrimination, either by establishing actual intent or an ADA violation.  On March 22, 2021, Martinez filed the FAC.

websites are accessible to blind and visually-impaired people" using screen reading software. "[The] guidelines recommend several basic components for making websites accessible" including "adding invisible alternative text to graphics, ensuring that all functions can be performed using a keyboard and not just a mouse; ensuring that image maps are accessible, and adding headings so that blind people can easily navigate websites. Without these very basic components, a website will be inaccessible to a blind or visually-impaired person using a screen reader."

The FAC alleged that "at all relevant times, it was [CW's] policy and practice to deny blind users, including [Martinez], equal enjoyment of and access to the website" by "fail[ing] and refus[ing] to remove access barriers on the website" "that prevent free and full use by [Martinez] and other blind persons using screen reading software."

The FAC further alleges CW "failed to take adequate action to correct these barriers even after being notified of the discrimination that such barriers cause," and lays out the manner in which Martinez so notified CW. Specifically, on August 13, 2020, Martinez's counsel sent CW a letter via overnight mail. The letter provided: "In short, your website (http://www.dropps.com/) is not fully accessible to visually-impaired individuals. Indeed, the California Supreme Court recently confirmed that anti-discrimination laws apply to commercial websites. We urge you to consult your own counsel about your rights and obligations in this emerging area of law. [¶] We plan to file suit in the near future. If you wish to discuss this matter, your counsel should promptly contact me." (Fn. omitted.) The letter did not identify any specific features of the website that were not accessible to Martinez or the method by which CW could make it compliant.

On August 20, 2020 (a week later), CW's counsel responded with an email indicating that CW's website "conformed with 'Level 2' of version 2.1 of the Web Content Accessibility Guidelines . . . and invited [Martinez] to identify 'a particular issue' to which [Martinez's] letter had referenced."

On August 24, 2020, Martinez's counsel sent CW's counsel "an email that, inter alia, offered to provide, upon reasonable request, a courtesy copy of [Martinez's] audit report documenting the communication barriers existing on the website, and a pre-filing settlement demand." CW's counsel requested the report on August 25, 2020, which Martinez's counsel sent later that same day. Martinez had performed the audit "of four specific webpages on the website" using "the well-known, free, automated web accessibility evaluation tool known as WAVE," "one of 162 web accessibility evaluation tools" identified on a public webpage.

On Sunday, August 30, 2020, Martinez's counsel sent CW's counsel an email "expressing [Martinez's] intention to file a complaint against [CW] during that week in light of the fact that [Martinez's] counsel had received no substantive response to [Martinez's] settlement demand of August 24, 2020." The next day (August 31, 2020), CW's counsel sent Martinez an email that confirmed that CW had reviewed the audit report, but "questioned [its] 'meaning' and asserted that 'it does not answer any of our questions.'" The email also reiterated CW's view that it complied with applicable guidelines and "stated for the first time that [CW] 'ha[d] also engaged a consultant to ensure ongoing compliance.'" CW provided no further details about the consultant.

Martinez filed suit that same day.

### B. *Relevant Procedural History*

In June 2021, the court sustained CW's demurrer to the FAC, without leave to amend, and thereafter entered a judgment of dismissal. Although the court's order does not explain its reasoning, the parties' arguments at the hearing focused on the two issues that had been the subject of the court's written ruling sustaining CW's demurrer to the original complaint, namely: (1) Whether Martinez had alleged facts establishing intentional discrimination, and (2) Whether CW's website constituted a "place of public accommodation" for purposes of the ADA. Martinez timely appealed.

## DISCUSSION

The Unruh Act provides: "All persons within the jurisdiction of this state . . . no matter what their . . . disability . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." (Civ. Code, § 51, subd. (b).) "A plaintiff can recover under the [Unruh Act] on two alternate theories: (1) a violation of the ADA (Civ. Code, § 51, subd. (f)); or (2) denial of access to a business establishment based on intentional discrimination." (*Martinez v. San Diego County Credit Union* (2020) 50 Cal.App.5th 1048, 1059 (*SDCCU*).)

On appeal, Martinez contends the FAC alleges facts sufficient to establish an Unruh Act claim under both theories. As to Martinez's first Unruh Act theory, we disagree that CW's response to Martinez's complaints about discriminatory effects of the facially neutral structure of CW's website is sufficient to establish intentional discrimination. As to Martinez's second Unruh Act theory, we conclude CW's website is not a "place of

7

public accommodation" for the purposes of the ADA, and that the FAC therefore fails to allege a violation of the ADA.

## I. The FAC Does Not Allege Facts Establishing Intentional Discrimination

Unless an Unruh Act claim is based on an ADA violation, the act requires a claimant to prove " 'intentional discrimination.' " (*Koebke, supra,* 36 Cal.4th at p. 854.) A claimant may not "rel[y] on the *effects* of a facially neutral policy on a particular group . . . to infer *solely* from such effects a discriminatory intent." (*Ibid.*; see also *ibid.* [" '[a] disparate impact analysis or test does not apply to Unruh Act claims' "].) Thus, absent an ADA violation, the Unruh Act requires allegations supporting " 'willful, affirmative misconduct' " (*id.* at p. 853) with the specific intent "to accomplish discrimination on the basis of [a protected trait]." (*Id.* at p. 854.) Although "evidence of disparate impact [may] be probative of intentional discrimination in some cases" under the Unruh Act, it cannot alone establish such intent. (*Ibid*, italics omitted.)

Martinez argues that the FAC alleges such " 'willful, affirmative misconduct' " (*Koebke, supra,* 36 Cal.4th at p. 853) sufficient to establish intentional discrimination and thus states a cause of action under the Unruh Act on that independent basis. Specifically, he argues the FAC allegations establish CW " 'failed to take adequate actions to correct' " accessibility barriers in its website " 'even after being notified' " of them in correspondence from Martinez's counsel. (Boldface and italics omitted.) But if, under the reasoning of *Koebke*, Martinez cannot establish CW's intent to discriminate by showing only that its website does not allow visually impaired individuals the same access available to those who are not visually impaired (i.e., a disparate effect of a neutral structure), it follows that CW's *failure to address* this disparate effect likewise cannot establish CW's intent to

8

discriminate. (*Koebke, supra*, at p. 854; see *Belton v. Comcast Cable Holdings, LLC* (2007) 151 Cal.App.4th 1224, 1237−1239 (*Belton*); see *id.* at pp. 1229−1230 & 1237 [defendant's practice of offering music services and television programming as a package without an option for consumers to buy only music services alone "applied equally to sighted and blind subscribers" was neutral on its face and thus not actionable despite alleged disproportionate impact on blind people]; see also *Greater Los Angeles Agency on Deafness, Inc. v. Cable News Network, Inc.* (9th Cir. 2014) 742 F.3d 414, 426−427 (*GLAAD*) [rejecting as part of a "misguided effort to import [a] 'deliberate indifference' standard into the Unruh Act context" plaintiff's attempt to prove intentional discrimination under the Unruh Act based in part on defendant's refusing plaintiff's request that defendant provide captioning for its videos on CNN.com when defendant's "policy of displaying online video programming without closed captioning applied equally to all CNN.com visitors, hearing-impaired or not"].)

Martinez attempts to distinguish federal cases reaching a similar result on the basis that the defendants in those cases took more corrective action than did CW after being informed that a facially neutral general policy was having a disparate impact on disabled individuals. (See, e.g., *GLAAD, supra,* 742 F.3d at p. 426 [noting in connection with intentional discrimination analysis that defendant had "respon[ded] to [plaintiff's] captioning request" by "stat[ing] that it offered a number of text-based services and explain[ing] that it would be 'ready to provide whatever web access is ultimately required' by the [Federal Communications Commission's] then-pending captioning rules"]; *Cullen v. Netflix, Inc.* (N.D.Cal. 2012) 880 F.Supp.2d 1017, 1024 ["allegations demonstrating [defendant's] efforts to improve access for hearing-impaired customers" such as that "the rate at which [defendant]

9

is captioning content has continued to increase since 2008" prevented an inference of intentional discrimination under the Unruh Act]; see also *Wilkins-Jones v. County of Alameda* (N.D.Cal. 2012) 859 F.Supp.2d 1039, 1052–1053 [plaintiff's "alleg[ations] that [d]efendants did not fully and timely comply with, e.g., her requests for medication (some were provided)" and that her requests for a wheelchair were refused "based on the inadequate assessments performed by [d]efendants" were "insufficient to reasonably infer discriminatory intent" under the Unruh Act].)  To the extent those federal cases suggest an Unruh Act plaintiff can prove intentional discrimination solely through a defendant's failure to adequately respond to complaints about discriminatory effects of a neutral policy or action—and we are not convinced that they all do—we disagree with them as inconsistent with *Koebke*.

Martinez cites *Ruiz v. Musclewood Property Investments, LLC* (2018) 28 Cal.App.5th 15 (*Ruiz*) for the proposition that, *Koebke* notwithstanding, a defendant's failure to correct a known accessibility problem resulting from an individual's disability can support an inference that the defendant is intentionally discriminating against that individual based on his disability. (*Id.* at p. 22.)  *Ruiz* involved a claim under the Disabled Persons Act, Civil Code section 54 et seq. (the DPA), not the Unruh Act. (*Ruiz, supra*, 28 Cal.App.5th at p. 21; see Civ. Code, § 54.3, subd. (a) [providing cause of action against "[a]ny person or persons, firm or corporation who denies or interferes with admittance to or enjoyment of the public facilities . . . or otherwise interferes with the rights of an individual with a disability under Sections 54, 54.1 and 54.2"].)  The court in *Ruiz* concluded that the "[d]efendants' guard dog's repeated attacks on plaintiff's guide dog and defendants' alleged knowledge of those attacks" over the

course of almost six months "permit[ted] a reasonable inference of intent" to discriminate against the plaintiff, who was blind. (*Ruiz*, *supra*, at p. 22.) Because the DPA does not require intent, however (see Civ. Code, § 54.3, subd. (a)), the court's conclusion regarding intent is dictum, even as it applies to the DPA. (*Ruiz, supra*, at p. 21.) In any case, applying *Ruiz*'s DPA-related dictum to an Unruh Act claim would be inconsistent with *Koebke*. *Ruiz* does not conclude otherwise. Indeed, *Ruiz* does not even mention *Koebke* or the Unruh Act. We thus disagree that *Ruiz* allows Martinez to prove intentional discrimination under the Unruh Act based on CW's failure to change a facially neutral policy or action—here, the structure of the CW website—in response to Martinez's complaints.

Because *Koebke* is a Supreme Court decision contrary to *Ruiz*'s dictum related to intent, it is not surprising that Martinez has not cited (nor are we aware of) any California case applying the intent-related dictum in *Ruiz* to an Unruh Act claim. Nor are we persuaded by the unpublished federal cases Martinez cites to support applying this concept in the Unruh Act context. (See *Martinez v. Adidas America, Inc.* (C.D.Cal. July 9, 2019, No. EDCV 19-841) 2019 WL 3002864; *Thurston v. ClearPath Lending, Inc.* (C.D.Cal. Jan. 28, 2019, No. SACV 18-2094) 2019 WL 366405.) Not only are these cases not binding on this court, they also assess federal question jurisdiction, and therefore deal only indirectly with the viability of a particular Unruh Act claim. (See *Martinez v. Adidas America, Inc., supra*, 2019 WL 3002864 at p. *4 [concluding Unruh Act complaint plausibly alleged a theory of intentional discrimination under a non-ADA legal theory]; *Thurston v. ClearPath Lending, Inc., supra*, 2019 WL 366405 at p. *3 [same].) Indeed, neither of these cases analyzes the intent issue in any depth, and thus neither is helpful

11

on this point. (See *Martinez v. Adidas America, Inc., supra*, 2019 WL 3002864 at p. \*4; *Thurston v. ClearPath Lending, Inc., supra*, 2019 WL 366405 at p. \*3.)

For these reasons, we do not recognize a failure to address known discriminatory effects of a policy as alone sufficient to establish intentional discrimination under the Unruh Act, and the FAC could not have stated a cognizable Unruh Act claim on this basis.

## II.  The FAC Does Not Allege Facts Establishing a Violation of the ADA, Because CW's Website Is Not a "Place of Public Accommodation"

We next turn to the issue of whether the FAC states an Unruh Act cause of action based on a violation of the ADA, which does not require proof of intentional discrimination. (See *Munson v. Del Taco, Inc.* (2009) 46 Cal.4th 661, 673 [need not prove intent to establish Unruh Act claim based on ADA violation].) Title III "prohibits discrimination against disabled individuals by private entities." (*SDCCU, supra,* 50 Cal.App.5th at p. 1059.) It provides: "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations *of any place of public accommodation* by any person who owns, leases (or leases to), or operates a place of public accommodation." (42 U.S.C. § 12182(a), italics added.) To establish a Title III violation, a plaintiff must show: (1) a covered disability; (2) that "the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied *public accommodations* by the defendant because of [the] disability." (*Molski v. M.J. Cable, Inc.* (9th Cir. 2007) 481 F.3d 724, 730, italics added; accord, *SDCCU, supra*, at p. 1060.)

12

### A. Case Law Is Inconsistent Regarding When a Website Constitutes a "Place of Public Accommodation" for Purposes of a Title III Violation

The question before us is whether CW's website constitutes a "place of public accommodation" for the purposes of Title III. (42 U.S.C. § 12182(a).) "The ADA defines the phrase '. . . public accommodation' by enumerating 12 categories of covered 'places' and 'establishments,' giving nonexclusive examples of types of enterprises falling into each category. [Citations.] The listed examples mainly reference physical locations. The implementing regulations similarly define a public accommodation by referring to a 'facility,' which is in turn defined as 'all or any portion of buildings, structures, sites, complexes, equipment, rolling stock . . . or other real or personal property, including the site where the building, property, structure, or equipment is located.' "[3] (*SDCCU, supra*, 50 Cal.App.5th at pp. 1060−1061, fn. omitted, quoting 42 U.S.C. § 12181(7)(A)−(L) & 28 C.F.R. § 36.104 (2022).) "A website is not identified in any of the statutory categories. This is not surprising as there were no commercial websites when the ADA was enacted in 1990. But in the 30 years since, websites have become central to American life. They are widely used by

---

[3] Recently (in June 2020) the Court of Appeal for the Fourth Appellate District thoughtfully and thoroughly summarized the state of the law in this area, which has not significantly changed in the two years since then. (*SDCCU, supra*, 50 Cal.App.5th at pp. 1060−1064.) In the interest of efficiency, rather than reinventing the proverbial wheel, we draw heavily from the court's summary in describing the legal landscape that informs the issue on appeal here, which *SDCCU* did not have occasion to reach. (See *id.* at p. 1071 ["we do not reach the legal issue whether the ADA applies to websites even without a nexus to a physical place"].)

both consumers and businesses to communicate information and conduct transactions, and are now essential tools in conducting daily affairs.  Thus, the issue whether websites are subject to ADA requirements has been the subject of a growing number of lawsuits, judicial attention, and academic commentary. [Citations].  [¶]  The regulatory agency charged with implementing the ADA [(the DOJ)] has previously endorsed the applicability of Title III to ' "[w]eb sites of public accommodations," ' but has not provided specific regulatory guidance."[4]  (*SDCCU, supra*, at p. 1061.)

### 1.    *Conflicting Views of Federal Courts*

"[T]he courts have reached different conclusions on the issue whether a website is a public accommodation.  The federal courts have expressed two main views."  (*SDCCU, supra*, 50 Cal.App.5th at p. 1061.)  One view "is that websites are 'public accommodations' within the meaning of the ADA.  This approach has been adopted by courts in the First, Second, and Seventh Circuits.  (*National Assn. of the Deaf v. Harvard University* (D.Mass. 2019) 377 F.Supp.3d 49, 57−59 . . . ; *Gil* [*v. Winn Dixie Stores, Inc.* (S.D.Fla. 2017)] 242 F.Supp.3d [1315,] 1318−1319 [(*Gil*)]; see *Carparts Distribution Center v. Automotive Wholesaler's Assn.* (1st Cir. 1994) 37 F.3d 12, 19−20 (*Carparts*); [*National Assn. of the Deaf v.*] *Netflix, Inc.* [(D.Mass. 2012)] 869 F.Supp.2d [196,] 201−203 [(*Netflix*)]; *Doe v. Mutual of Omaha Ins. Co.* (7th Cir. 1999) 179 F.3d 557, 559 [(*Mutual of Omaha*)]; *Access Living of Metropolitan Chicago v. Uber Technologies, Inc.* (N.D.Ill. 2018) 351 F.Supp.3d 1141, 1155−1156; *Pallozzi v. Allstate Life Ins. Co.*

---

[4] The DOJ's stated views on this issue and their role in our analysis are addressed in more detail in Discussion part II.C, *post*.

(2d Cir. 1999) 198 F.3d 28, 32 [(*Pallozzi*)]; *Andrews v. Blick Art Materials, LLC* (E.D.N.Y. 2017) 268 F.Supp.3d 381, 390−393 . . . ; *National Federation of the Blind v. Scribd Inc.* (D.Vt. 2015) 97 F.Supp.3d 565, 567−576 . . . .) [¶] Courts adopting this view have relied on the 'service establishment[s]' category of the statutory definition, and particularly the fact that 'travel service' is contained in the illustrative list of these establishments ([42 U.S.C.] § 12181(7)(F) . . . ), suggesting that Congress must have contemplated a public accommodation would 'include providers of services which do not require a person to physically enter an actual physical structure.' (*Carparts, supra*, 37 F.3d at p. 19; see *Scribd, supra*, 97 F.Supp.3d at p. 572.) The *Carparts* court observed, 'It would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not. . . .' (*Carparts*, [*supra*,] at p. 19; see *Andrews*, *supra*, 268 F.Supp.3d at p. 396; *Scribd*, [*supra*,] at pp. 572−573.) [¶] These courts have also emphasized the critical nature of websites for transacting business in one's daily life, and that Congress made clear its intention that the ADA adapt to changes in technology." (*SDCCU, supra*, 50 Cal.App.5th at p. 1062.)

The second view of the issue taken by federal courts "is that websites are not 'public accommodations' under the ADA, but a denial of equal access to a website can support an ADA claim if the denial has prevented or impeded a disabled plaintiff from equal access to, or enjoyment of, the goods and services offered at the defendant's physical facilities. This view has been adopted by courts in the Third, Sixth, Ninth, and Eleventh Circuits. (*Gil, supra*, 242 F.Supp.3d at p. 1319; see *Robles* [*v. Domino's Pizza, LLC* (9th Cir. 2019)] 913 F.3d [898,] 905−906 [(*Robles*)]; *Menkowitz v. Pottstown Memorial Medical Ctr.* (3d Cir.

15

1998) 154 F.3d 113, 122 . . . ; *Mahoney v. Bittrex, Inc.* (E.D.Pa. Jan. 14, 2020, No. CV 19-3836) 2020 WL 212010, p. *2 . . . ; *Parker v. Metropolitan Life Ins. Co.* (6th Cir. 1997) 121 F.3d 1006, 1010–1014 . . . ; *Castillo v. Jo-Ann Stores, LLC* (N.D.Ohio 2018) 286 F.Supp.3d 870, 876–881 . . . ; *Haynes v. Dunkin' Donuts, LLC* (11th Cir. 2018) 741 Fed. Appx. 752, 754 . . . ; *Gomez v. General Nutrition Corp.* (S.D.Fla. 2018) 323 F.Supp.3d 1368, 1375 . . . ; see also *Rendon v. Valleycrest Productions, Ltd.* (11th Cir. 2002) 294 F.3d 1279, 1284–1286.)" (*SDCCU, supra*, 50 Cal.App.5th at p. 1063.)

"The courts adopting this narrower . . . definition of a 'public accommodation' have relied on Congress's explicit listing of the type of places considered to be 'public accommodations,' and have emphasized that essentially all of these categories describe a physical location. [Citations.] With respect to [42 U.S.C.] section 12181(7)(F)'s identification of 'service establishment[s]' such as a 'travel service,' these courts have noted that under the statutory construction canon '*noscitur a sociis*,' a statutory term must be construed in the context of the accompanying words, thus supporting that a 'travel service' also identifies a physical place. [Citations.] [¶] But these courts also recognize that a website can be important to providing access to a defendant's public accommodation (physical premises) and to a disabled person's ability to use and enjoy services provided at those places, and thus to the extent barriers on the website impinges on the plaintiff's ability to access such benefits at a physical premises, the claim can be actionable under a nexus theory. (See *Robles, supra*, 913 F.3d at pp. 904–906; [citations].) The rationale underlying the adoption of this nexus standard mirrors many of the public policies discussed by the courts in adopting the broader view that all websites are directly subject to the ADA, e.g., that Congress

16

would have intended this result given the growing importance of websites for consumers and businesses.  [Citation.]" (*SDCCU, supra*, 50 Cal.App.5th at pp. 1063–1064, fn. & italics omitted.)

### 2. *Relevant California Precedent*

The limited California case law on this topic offers little guidance in navigating this federal circuit split.  At least two California Courts of Appeal have applied the nexus analytical framework in assessing whether a website is a place of public accommodation.  (See *SDCCU, supra*, 50 Cal.App.5th 1048; *Thurston v. Midvale Corp.* (2019) 39 Cal.App.5th 634 (*Thurston*).)  Because both these cases determined the requisite nexus existed, however, neither provided an occasion for the court to consider under what circumstances, if any, a standalone website can meet this definition.

In *Thurston*, a blind woman sued a restaurant for disability discrimination under the Unruh Act for maintaining a website that was incompatible with her screen reading software.  (*Thurston*, supra, 39 Cal.App.5th at pp. 636−638.)  *Thurston* applied a nexus-based approach and upheld summary judgment in the plaintiff's favor on a theory that the restaurant had violated the ADA.  (*Thurston, supra*, at pp. 642−646.)  In so doing, Division Eight of this court explained that "including websites connected to a physical place of public accommodation is not only consistent with the plain language of Title III, but it is also consistent with Congress's mandate that the ADA keep pace with changing technology to effectuate the intent of the statute." (*Thurston, supra*, at p. 644.)  It further noted, however, that because the restaurant had a physical presence, the court "need not consider . . . the wholly hypothetical question whether Title III governs a website unconnected to a physical place of public

accommodation offering only purely Internet-based services or products." (*Ibid.*)

*SDCCU* similarly applied the nexus standard to an ADA-based Unruh Act claim regarding the accessibility of a website of a bank that maintained physical facilities. (*SDCCU, supra*, 50 Cal.App.5th at pp. 1053 & 1070–1071.) "Because [the court] . . . concluded [the plaintiff's] allegations were sufficient to satisfy the nexus standard, [the court] [did] not reach the legal issue whether the ADA applies to websites even without a nexus to a physical place." (*SDCCU, supra*, at p. 1071.)

*Belton, supra,* 151 Cal.App.4th 1224 addresses the related issue of whether a digital cable service constitutes a place of public accommodation for the purposes of the ADA. In *Belton*, cable subscribers brought an action against a cable service provider, challenging the provider's practice of offering radio and music service only when bundled together with television service. The plaintiff's claim was that "the [television] programming provided in the basic cable tier is 'inaccessible' to blind people, and therefore [the cable provider] must accommodate blind individuals by providing FM or music services á la carte." (*Belton, supra*, 151 Cal.App.4th at p. 1238.) The court affirmed summary judgment for the cable provider on that basis that, in order "to state a claim under the ADA, plaintiffs must show that they have been denied access to a place of public accommodation and, as a matter of law, cable services are not such a place." (*Belton, supra*, at p. 1238, italics omitted.) In so holding, *Belton* relied heavily on and adopted the reasoning of *Torres v. AT&T Broadband, LLC* (2001) 158 F.Supp.2d 1035, which held that a digital cable service was not a place of public accommodation. (*Belton, supra*, at p. 1238, citing *Torres, supra*, at p. 1037.) In the language *Belton* quotes from *Torres,* the court explained that " '[t]he ADA includes

18

an exhaustive list of private entities that constitute a public accommodation, and a digital cable system is not one of them.' " (*Belton, supra*, at p. 1238, quoting *Torres, supra*, at p. 1037.) *Belton* also relies on *Torres*'s further "reject[ion] [of] the plaintiff's argument that 'when he uses the defendants' digital cable channel menu, his television set becomes a place of exhibition or entertainment. [T]he plaintiff's home cannot reasonably be classified as a place of public exhibition or entertainment. Thus, neither the digital cable system nor its on-screen channel menu can be considered a place of public accommodation within the meaning of the ADA.' " (*Belton, supra*, at p. 1238−1239, italics omitted, quoting *Torres, supra*, at pp. 1037–1038.)

CW argues that *Belton* is dispositive on the public accommodation issue and requires us to reject an interpretation of "place of public accommodation" that encompasses websites without any connection to a physical space. But *Belton* is distinguishable in terms of its facts and reasoning, and thus does not dictate our analysis in the instant appeal. Namely, *Belton* involved a very different type of digital "place" than the one at issue here. The fact that one type of digital place (a digital cable menu or system) does not constitute any of the "public accommodation" listed in Title III does not mean another type of digital place (a retail website) also does not. *Belton* concluded that a digital cable platform is not a modern-day version of "a motion picture house" (or any other statutorily enumerated type of public accommodation). (42 U.S.C. § 12181(7)(C).) We do not necessarily disagree. But that does not preclude us from concluding that a different category referenced in the relevant statute ("sales and rental establishment[s]") includes a different digital place (a retail website like CW's). And *Belton* does not expressly rely on the reasoning in *Torres* regarding the definition of "facility"

19

in the implementing regulations of the ADA.  *Belton* thus does not answer the question posed by this appeal.[5]

**B.**   ***Considered Together, the Plain Language of the Statute, Maxims of Statutory Construction, and Legislative History Pre-dating the Passage of Title III Do Not Establish That Purely Digital Retail Websites Are "Places of Public Accommodation"***

"[T]he fundamental goal of statutory interpretation is to ascertain and carry out the intent of the Legislature."  (*People v. Cruz* (1996) 13 Cal.4th 764, 782.)  " 'To determine legislative intent, a court begins with the words of the statute, because they generally provide the most reliable indicator of legislative intent.' [Citation.] . . . [Citation.]  'If there is no ambiguity in the language, we presume the Legislature meant what it said and the plain meaning of the statute governs.' " (*Diamond Multimedia Systems, Inc. v. Superior Court* (1999) 19 Cal.4th 1036, 1047.)  We will not follow the plain meaning of the statute if to do so "would inevitably frustrate the manifest purposes of the legislation as a whole or lead to absurd results."  (*In re Ge M.* (1991) 226 Cal.App.3d 1519, 1523.)

Martinez argues that the plain meaning of "place of public accommodation" is alone sufficient for us to adopt the broader view taken by several federal courts—namely, that a physical place is not a necessary component of the ADA's definition of a place of public accommodation.  (See, e.g., *Carparts, supra*, 37 F.3d at pp. 19–20; *Netflix, supra*, 869 F.Supp.2d at pp. 201–203; *Mutual*

---

[5] Nor, for that matter, do the other California decisions noted above, *Thurston* and *SDCCU*, as both expressly disclaim that they reach this issue.  (*SDCCU, supra*, 50 Cal.App.5th at p. 1071; *Thurston, supra*, 39 Cal.App.5th at p. 644.)

*of Omaha, supra*, 179 F.3d at p. 559; *Pallozzi, supra,* 198 F.3d at p. 32.)

We disagree that the plain language of the statute is alone sufficient to decide the issue—let alone sufficient to decide the issue in Martinez's favor. First, the plain meaning of the term "place" weighs against adopting Martinez's proposed interpretation. Dictionaries "overwhelmingly" define "place" as involving a physical location.[6] (*Winegard, supra,* 556 F.Supp.3d at p. 179.) Neither Title III nor any implementing regulations provide a different definition of the word for the purposes of Title III. Nor does the state of technology when the ADA was passed in 1990 suggest that Congress was unaware that the term carried a connotation of physical space and thus could exclude certain "sales and retail establishments" from the scope of Title III based on a lack of connection to a physical space. "[T]here were countless . . . businesses operating outside of brick-and-mortar premises in 1990, including some that had been in operation for decades," such as mail order catalogs. (*Winegard, supra*, 556 F.Supp.3d at pp. 177−178.) Congress's decision to nevertheless use the phrase "place," the plain meaning of which involves physical space, could easily be understood as an intentional exclusion

---

[6] "Webster's Third [New International Dictionary], for example, begins with the following definitions: '1. open space in a city, space, locality'; '1.a. a way for admission or transit'; '1.b. physical environment'; '1.c. physical surroundings.' (Webster's Third New International Dictionary 1727 (2002).) Webster's Second [New International Dictionary], similarly, begins with: 'An open space, or square, in a city or town.' (Webster's Second New International Dictionary 1877 (1945).)" (*Winegard v. Newsday LLC* (E.D.N.Y. 2021) 556 F.Supp.3d 173, 179 (*Winegard*).)

21

of businesses without any physical presence from the scope of Title III—even if they might constitute "sales and retail establishments" under section 12181(7) of title 42 of the United States Code.  Finally, the United States Supreme Court has recently noted "place" connotes a physical space, at least in the context of a New Jersey law protecting against discrimination in "places of public accommodation."  (See *Boy Scouts of America v. Dale* (2000) 530 U.S. 640, 657.)  Specifically, the court reversed a summary judgment ruling that treated the Boy Scouts organization as a "place of public accommodation" under New Jersey law, noting that, although such laws have been interpreted broadly, "the New Jersey Supreme Court went a step further and applied its public accommodations law to a private entity without even attempting to tie the term 'place' to a physical location."  (*Ibid.*)  Both the plain meaning of the word, and its meaning considered in historical context, do not support Martinez's proposed interpretation of "place of public accommodation."

Turning to the entire phrase, "place of public accommodation," the plain meaning of the statute's language is not dispositive, because there is no "plain meaning" of this phrase. Decades of conflicting federal case law interpreting it establishes that, instead, the term is ambiguous.

The term "facility"—a necessary component of the definition of "place of public accommodation" under the Code of Federal Regulations (28 C.F.R. § 36.104 (2022))—is ambiguous for largely the same reason.

"When the statutory text is ambiguous, or it otherwise fails to resolve the question of its intended meaning," we proceed to the second step, and "look to the statute's legislative history and the historical circumstances behind its enactment." (*Klein v. United States of America* (2010) 50 Cal.4th 68, 77.)  "In this step, courts

22

may 'turn to secondary rules of interpretation, such as maxims of construction, "which serve as aids in the sense that they express familiar insights about conventional language usage." ' " (*Alejo v. Torlakson* (2013) 212 Cal.App.4th 768, 787 (*Alejo*), quoting *Katz v. Los Gatos-Saratoga Joint Union High School Dist.* (2004) 117 Cal.App.4th 47, 55.)  Martinez argues that these tools of statutory interpretation—in particular legislative history—support his proposed construction of Title III.  For reasons we discuss below, on balance, these interpretative tools do not provide a basis on which we can adopt Martinez's proposed interpretation.  Rather, they lead us to the opposite conclusion.

Maxims of statutory construction support adopting a narrow interpretation of "place of public accommodation."  As previously noted, regulations define "place of public accommodation" as "a facility operated by a private entity whose operations affect commerce and fall within at least one of" the 12 categories specifically listed in section 12181(7) of title 42 of the United States Code.  (28 C.F.R. § 36.104 (2022).)  Regulations further define "facility" under Title III as "all or any portion of buildings, structures, sites, complexes, equipment, rolling stock or other conveyances, roads, walks, passageways, parking lots, or other real or personal property, including the site where the building, property, structure, or equipment is located."  (28 C.F.R. § 36.104 (2022).)  "[T]he expression of certain things in a statute necessarily involves exclusion of other things not expressed—*expressio unius est exclusio alterius*."  (*Henderson v. Mann Theatres Corp.* (1976) 65 Cal.App.3d 397, 403.)  Thus, the only way a website might constitute a "facility" is if it qualifies as one of these items in the definition of "facility."

Martinez urges that a website qualifies as "other personal property" and therefore constitutes a "facility."  But "a word

23

is known by the company it keeps" and should not be given "a meaning so broad that it is inconsistent with its accompanying words." (*Yates v. United States* (2015) 574 U.S. 528, 543; see also *People v. Garcia* (2016) 62 Cal.4th 1116, 1124 [recognizing and applying the principle of *noscitur a sociis*].) The term "other . . . personal property" appears at the end of a list of exclusively physical spaces and, as to "equipment" or other "personal property," presupposes the existence of a "site where the . . . property . . . is located." (28 C.F.R. § 36.104 (2022).) Under the principles of *noscitur a sociis* and *expressio unius est exclusio alterius*, it would seem that a website cannot constitute a "facility" and thus, cannot constitute a "place of public accommodation."

Martinez argues that we must nevertheless interpret the terms "facility" and "place of public accommodation" broadly enough to include all retail websites, because to do otherwise would lead to an absurd result. Specifically, he argues it would be absurd for Title III to treat a sales transaction differently, depending on the venue through which it occurs. The First Circuit Court of Appeals found this principle persuasive in holding a "place of public accommodation" does not require any kind of a physical presence. It concluded that "[i]t would be irrational to conclude that persons who enter an office to purchase services are protected by the ADA, but persons who purchase the same services over the telephone or by mail are not. Congress could not have intended such an absurd result." (See *Carparts, supra*, 37 F.3d at p. 19.)

We disagree. Although treating retail websites like other retailers in 2022 does make sense, it does not follow that treating them differently from brick and mortar retailers cannot also make sense. We do not view it as absurd or irrational for Congress to address discrimination by online retailers in a different manner

24

than it addresses discrimination by brick and mortar retailers. These are, after all, two distinct types of retailers, each subject to a disparate bundle of economic and business concerns. The central role websites play in modern commerce cannot change that they are their own animal, a creature unlike brick and mortar establishments.

Because brick and mortar stores conduct business differently than do retail websites, the type and extent of the burdens anti-discrimination measures impose on a business will necessarily differ depending on whether the business is operating through a physical storefront or a purely digital one. Given the different burden-benefit calculus that would apply in determining how to impose accessibility requirements on these two different types of retailers, it would not be an absurd result that Title III addresses only physical retailers, and that the question of how to properly balance the benefits and burdens of imposing similar requirements on purely digital retailers remains for Congress to separately consider. We thus conclude that it would not be an absurd result to interpret Title III as treating transactions differently depending on whether they are purely digital or have a physical component, and that avoiding an absurd result therefore cannot drive our interpretation of the language at issue.

Martinez further argues that we must interpret the terms "place of public accommodation," "other personal property," and "facility" broadly enough to include digital-only websites, because doing otherwise would be inconsistent with the purpose of Title III, and inconsistent with the edict that we are to interpret the ADA broadly and with its purpose in mind. The purpose of Title III is " 'to bring individuals with disabilities into the economic and social mainstream of American life . . . in a clear, balanced, and reasonable manner' " and afford "people with disabilities . . .

25

equal access to the array of goods and services offered by private establishments and made available to those who do not have disabilities." (*Gniewkowski v. Lettuce Entertain You Enterprises, Inc.* (W.D.Pa. 2017) 251 F.Supp.3d 908, 916; accord, *PGA Tour, Inc. v. Martin* (2001) 532 U.S. 661, 674−675.) Today, the "economic and social mainstream of American life" takes place in large part on the internet; websites are one of the primary ways the public may gain "access to the array of goods and services offered by private establishments." (*Gniewkowski, supra,* at p. 916; see *Packingham v. North Carolina* (2017) 582 U.S. __ [198 L.Ed.2d 273, 137 S.Ct. 1730, 1735] [referring to "cyberspace" as the most important "place[ ]" for the exchange of views]; see also *Thurston*, *supra*, 39 Cal.App.5th at p. 643 [noting the internet's " 'prevalence and power have changed the dynamics of the national economy' "], quoting *South Dakota v. Wayfair* (2018) 585 U.S. __ [201 L.Ed.2d 403, 138 S.Ct. 2080, 2097].) Martinez also stresses that legislative history supports "that Congress intended the ADA to adapt to changes in technology." (*Netflix, supra,* 869 F.Supp.2d at pp. 200−201, citing H.R.Rep. No. 101-485, 2d Sess., p. 108 (1990), reprinted in 1990 U.S. Code Cong. & Admin. News, pp. 303, 391.) Specifically, the Legislature "intend[ed] that the types of accommodation and services provided to individuals with disabilities, under all of the titles of this bill, should keep pace with the rapidly changing technology of the times"—in this instance, with technology that permits a company to offer wide ranges of goods or services for sale without having any physical storefront. (H.R.Rep. No. 101-485, 2d Sess., p. 108 (1990), reprinted in 1990 U.S. Code Cong. & Admin. News, pp. 303, 391.)

We agree with Martinez that reaching his desired result— lessening barriers to accessing electronic commerce faced by disabled individuals—would be consistent with the general, overall

26

goal of Title III. But not everything that is consistent with the goal of Title III can be found in the language of that statute. And simply because one interpretation would be consistent with the overall goal of the statute does not necessarily mean that a different interpretation "would inevitably frustrate the manifest purposes of the legislation as a whole" (*In re Ge M., supra,* 226 Cal.App.3d at p. 1523)—particularly when, as here, the law inherently involves a balancing of benefits and burdens to different stakeholders.

Nor is the mandate to interpret that language broadly, and in a manner that takes into account changes in technology, a blanket authorization to require anything that would achieve the ADA's overall goal of equal access. Congress chose specific language. Given the lack of support for interpreting "place" or "place of public accommodation" as including digital websites under the plain meaning of these terms and the canons of statutory construction, we are loathe to rely entirely on the broad goals of the statute as a sufficient basis for doing so. Based on the language Congress (and the DOJ in implementing regulations) chose, even considered in the context of Title III policy goals and a need to interpret the law expansively, it is not clear that Congress intended this result in drafting Title III.

Thus, even after examining the language of the statute and considering maxims of statutory interpretation and legislative history pre-dating passage of the law, we remain without a clear answer as to whether a purely digital retail website can constitute a "place of public accommodation" in the context of Title III.

### C. Based on Legislative History Since Congress Passed Title III, This Court May Not Interpret Title III As Covering Digital-Only Websites

" 'If ambiguity remains after resort to secondary rules of construction and to the statute's legislative history, then we must cautiously take the third and final step in the interpretive process. [Citation.] In this phase of the process, we apply "reason, practicality, and common sense to the language at hand." [Citation.] Where an uncertainty exists, we must consider the consequences that will flow from a particular interpretation.' " (*Alejo, supra*, 212 Cal.App.4th at p. 788.) Based on such an analysis, we ultimately find dispositive that adopting Martinez's proposed interpretation of "place of public accommodation" would mean embracing a view that Congress (through its inaction since the enactment of the ADA) and the DOJ (through its unwillingness to draft regulations) have both tacitly rejected.

Congress and the DOJ have long been aware of the confusion in the courts regarding whether and when a website can be considered a "place of public accommodation," but have chosen not to clarify the issue through amendments to the statute or additional rulemaking. The federal circuit split began in the 1990's, and resolving it—be it through judicial or legislative means—has been the topic of legal scholarship ever since then.

In addition, as early as 2000, Congress began holding hearings to discuss the significance, for purposes of interpreting the ADA, of the fact that commerce was increasingly occurring online. At a February 9, 2000 oversight hearing before the Subcommittee on the Constitution of the Committee on the Judiciary on the "Applicability of the Americans with Disabilities Act (ADA) to Private Internet Sites," the committee noted that the "[f]ederal government is scheduled to promulgate handicapped

28

accessibility requirements that will apply to [f]ederal department and agency Internet sites" which would "likely be used as a model for Internet accessibility requirements by litigants suing private providers of Internet web sites and services under the [ADA]." (H.R.Rep. No. 106-1048, 2d Sess., p. 275 (2001).)  It further heard from the DOJ, which was of the opinion "that the ADA's accessibility requirements do apply to private Internet web sites and services." (*Ibid.*)  The committee recognized that the changing role of internet commerce "raise[d] issues related to the new significance of the Internet economy to recent economic growth, the costs that application of the ADA would impose on that rapidly expanding segment of the economy, and the substantial First Amendment implications of applying the ADA to private Internet web sites and services." (*Ibid.*)  These same issues were again discussed at a September 13, 2006 hearing before the same committee.  (See, e.g., Hearing before House Com. on Judiciary, Subcom. on Constitution, 109th Cong., 2d Sess., at pp. 924−925 (Sept. 13, 2006) [testimony that 98 percent of websites are inaccessible to disabled individuals and that access to the internet is crucial in modern society]; *id.*, p. 105 [statement advocating for interpreting Title III to cover websites]; *id.*, p. 97 [testimony suggesting congress intended ADA to expand to account for changes in technology like those related to internet commerce].)

Nevertheless, when Congress amended the ADA in 2008, it did so to clarify a *different* area of judicial confusion interpreting the scope of the act related to the definition of "disability." (See Pub.L. No. 110-325 (Sept. 25, 2008) 122 Stat. 3553; Hearing before House Com. on Judiciary, Subcom. on Constitution, Civil Rights and Civil Liberties, 111th Cong., 2d Sess., at p. 2 (Apr. 22, 2010).) It took no similar legislative action to clarify "place of public accommodation."  Thereafter, in 2010, a congressional committee

29

expressly acknowledged the need for clarification in this area in order to realize the goals of the ADA, and called upon the DOJ to act. Specifically, at an April 22, 2010 congressional committee hearing on "Achieving the Promises of the Americans with Disabilities Act in the Digital Age," the introductory remarks of the congressional committee chairman noted that "[t]hrough informal guidance, the [DOJ] consistently has taken the position that public and private entities must ensure that individuals with disabilities have equal access when the goods or services are provided over the Internet or through other evolving technologies. But the [DOJ] has yet to modernize its regulations to make that clear, and the courts have struggled to articulate a consistent approach. [¶] This lack of clarity is harmful and places individuals with disabilities at great risk of being left behind. It also leaves public and private entities uncertain as to whether they are subject to and, for that matter, in compliance with ADA requirements. I therefore urge the [DOJ] to update its regulations and hope to hear today about its plans to issue guidance that clarifies application of the law and provides meaningful resources for entities seeking to comply. [¶] With this additional clarity and guidance, I am hopeful that we will avoid a repeat of the problems that we encountered with the court's misinterpretation of the definition of the word 'disability' in the ADA. In correcting the courts unduly restrictive interpretation of this term, we made clear that we will not tolerate a narrow reading of the ADA. [¶] That same message should apply with full force as the courts interpret and apply key phrases like 'place of public accommodation' in Title III of the Act. The notion that Congress prohibited discrimination only when it occurs in a physical place or required structural changes only to physical places is not consistent with the spirit and the plain language of the law." (Hearing before House Com. on Judiciary, Subcom.

on Constitution, Civil Rights and Civil Liberties, 111th Cong., 2d Sess., at p. 2 (Apr. 22, 2010).)

In response, the DOJ representative at the hearing indicated in no uncertain terms that the DOJ viewed websites, whether or not associated with a physical place, as places of public accommodation under Title III.  (See, e.g., Hearing before House Com. on Judiciary, Subcom. on Constitution, Civil Rights and Civil Liberties, 111th Cong., 2d Sess., at pp. 6 & 16 (Apr. 22, 2010).) The DOJ has offered the same view in amicus briefs filed in various federal courts for over 20 years.[7]  Yet the DOJ has chosen not to exercise its rulemaking power and issue any regulations on this topic.  Instead, it continues to file amicus briefs, and earlier this year issued guidance that—unlike those amicus brief submissions—is ambiguous as to whether a brick and mortar presence is necessary for a website to constitute a "place of public accommodation."  Namely, the 2022 guidance provides:  "A website with inaccessible features can limit the ability of people with disabilities to access a public accommodation's goods, services, and privileges available through that website—for example, a veterans' service organization event registration form.  [¶]  For these reasons, the [DOJ] has consistently taken the position that the

---

[7] Martinez has requested that this court take judicial notice of these and other DOJ-related documents, including DOJ consent decrees taking a similar position.  CW has filed a request for judicial notice of other DOJ-related materials as well.  We hereby grant these requests.  (See Evid. Code, §§ 459, subd. (a), 452, subds. (c) & (d) [permitting judicial notice of "[o]fficial acts of the . . . executive . . . departments of the United States" and "[r]ecords of . . . any court of record of the United States"]; *People v. Morales* (2018) 25 Cal.App.5th 502, 511, fn. 7 ["courts may take judicial notice of information published on official government websites"].)

ADA's requirements apply to all the goods, services, privileges, or activities offered by public accommodations, including those offered on the web." (U.S. Dept. of Justice, *Guidance on Web Accessibility, and the ADA* (Mar. 18, 2022) <http:beta.ada.gov/resources/web-guidance> [as of July 29, 2022], boldface omitted.)

It thus appears that, no later than 2010, Congress and the DOJ (1) both recognized the need to clarify whether and under what circumstances a website might constitute a "place of public accommodation," and (2) agreed that such clarification should take a broad and inclusive approach. The only conclusion we can draw from their failure in the 12 years that followed to provide any such clarification through regulation or statute is that neither officially endorses this approach. We cannot attribute this inaction to Congress's difficulty with or reluctance to draft laws specifically addressing websites, given that the ADA expressly addresses accessibility of *some* websites for disabled individuals—it just does not do so in the context of Title III. Specifically, federal departments and agencies must provide individuals with disabilities the same level of access to electronic and information technology—including through websites—as that enjoyed by individuals without disabilities. (29 U.S.C. § 794d(a)(1)(A).)

Congress's failure to provide clarification in the face of known confusion—and, to a lesser extent, the DOJ's similar failure—is not a reason for us to step in and provide that clarification. To the contrary, it is a reason for us *not* to do so. This is particularly true, given that providing clarification in the manner Martinez requests could have sweeping effects far beyond this case, none of which has been the subject of legislative fact-finding.

Martinez urges that the DOJ has in fact acted to clarify the confusion through amicus briefs and consent decrees in various

cases, which take the position that a website not associated with any physical location can constitute a public accommodation.  The parties have extensively briefed the issue of whether and in what way we should consider these documents.  "[I]t is unsettled how much *Chevron* deference[8] is to be given to an agency's informal policy pronouncements.  This category includes . . . [, for example,] the amicus curiae brief[s]; and though we know . . . [citation] that, in some circumstances at least, an agency's amicus brief is entitled to some deference, it cannot be very great when it is the brief of an agency that has, and has exercised, rulemaking powers yet has unaccountably failed to address a fundamental issue on which the brief takes a radical stance." (*Mutual of Omaha, supra,* 179 F.3d at p. 563, fn. added.)  This is the case with the DOJ and the primary issue on appeal.  Considered in this context, such nonbinding and case-specific pronouncements of the DOJ do not provide a basis for us to do what Congress (and, for that matter, the DOJ itself) has apparently made a conscious choice not to do.  And unlike an amicus brief, our interpretation of the ADA will affect cases other than the one before us.

In sum, we do not view the DOJ's willingness to support Martinez's proposed interpretation only in case-specific scenarios— while declining to adopt the position via rulemaking action— as weighing in favor of our adopting that interpretation.  To the contrary, we conclude the DOJ's approach to the issue weighs against our adopting such an interpretation.  As noted, we agree it would serve the goals of the Title III to interpret "facility" and, by

---

[8] Under *Chevron U.S.A., Inc. v. Natural Res. Def. Council* (1984) 467 U.S. 837, the United States Supreme Court held that, in interpretating a statute, a regulatory agency's construction of the statute is entitled to deference from the courts.  (*Id.* at p. 865; *City of Arlington v. F.C.C.* (2013) 569 U.S. 290, 296.)

extension, "place of public accommodation"[9] as covering websites, but that does not necessarily mean no other goals or considerations weigh against a blanket application of Title III to all websites. Ours is not to draft a law that chooses from among these various goals; ours is to interpret the law as written, an enterprise in which we are guided by legislative intent. We ultimately conclude that the language of the statute, when considered in the context of Congress's failure to act and the DOJ's silence in terms of formal guidance, does not permit us to adopt an interpretation of the statute that is not dictated by its language, especially in the face of the legislative and agency inaction described above.

### D. *Because CW's Website Does Not Constitute a "Place of Public Accommodation," the FAC Does Not Allege a Title III Violation*

Based on all of the factors we discuss above, we conclude that CW's website is not a "place of public accommodation" under Title III as currently written. Thus, the FAC also cannot state a claim under the Unruh Act based on CW's denying Martinez access to CW's website in a manner that violates Title III.

Given that the FAC also fails to allege intentional discrimination, it fails to state a viable legal claim under the Unruh Act, and the court correctly sustained CW's demurrer.

---

[9] As noted, in order to constitute a "place of public accommodation," the entity at issue must be both a "facility" and a public accommodation. (28 C.F.R. § 36.104 (2022).) Therefore, given our conclusion that a standalone website cannot constitute a facility, we need not reach the issue of whether, or under what circumstances, such websites also constitute "sales and retail establishments" or any other of the enumerated categories of "[p]ublic accommodation[s]" under section 12181(7)(E) of title 42 of the United States Code.

As to the dismissal with prejudice, Martinez argues that he should be permitted leave to amend only if this court determines that he "potentially could have" "sufficiently plead his intentional discrimination theory of liability" "based on evidence provided to the trial court indicating that the website continued to remain inaccessible to blind individuals even after the filing of the FAC." (Capitalization omitted.) We do not so conclude. For the reasons we outline above, allegations that CW failed to ameliorate discriminatory effects of its facially neutral website—even for a longer period of time than alleged in the FAC—cannot establish intentional discrimination. Therefore, the court did not err in sustaining the demurrer without leave to amend.

## DISPOSITION

Accordingly, the judgment dismissing the complaint is affirmed.  The parties shall bear their own costs on appeal.

CERTIFIED FOR PUBLICATION.


ROTHSCHILD, P. J.

We concur:


CHANEY, J.


BENDIX, J.